# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**VALERIE K. BOOTS**
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MICHAEL GENE WORDEN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MARQ HALL, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A05-1312-CR-614 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Marc T. Rothenberg, Judge
Cause No. 49G02-1210-FA-68981

**September 4, 2014**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

Marq Hall appeals his conviction for child molesting, as a Class A felony, following a jury trial. He presents three issues for our review, which we consolidate and restate as:

1.  Whether the trial court abused its discretion when it excluded certain impeachment evidence at trial.

2.  Whether the trial court abused its discretion when it denied his motion to compel discovery.

We reverse and remand for a new trial.

## FACTS AND PROCEDURAL HISTORY

In September 2012, Hall and A.D. were living together in Indianapolis, and A.D.'s twelve-year-old daughter, M.T., lived with them. Hall and M.T. generally got along, but M.T. had reported to others that she "hated" Hall. Tr. at 98. On September 19, Hall and A.D. were in the midst of breaking up, but Hall had not yet moved out. M.T. stayed home from school that day, and A.D. went to work. Hall was home with M.T., and at some point in the afternoon, Hall told M.T. to "go do [her] position" on his bed.[1] Id. at 51. Hall then entered the bedroom, approached M.T., and rubbed his penis on the crotch area of M.T.'s gym shorts. Hall told M.T. to pull down her pants, but she refused to do so. Hall then pulled down M.T.'s shorts and underwear and forced her to have sexual intercourse.[2] Hall made a "sexual comment" to M.T., and M.T. said to Hall, "You're

---

[1] When asked to explain what it meant for Hall to tell her to "get in [her] position," M.T. stated that "instead of getting grounded or in trouble[, she] had to be thrown on the bed[.]" Tr. at 52. M.T. testified further that she would "put [her] knees on the bed and [Hall] put his arm around [her] stomach and then he [threw her] . . . onto the bed." Id. at 56.

[2] M.T. subsequently testified that she could not recall whether Hall ejaculated.

2

mom's boyfriend. You're mom's boyfriend." Id. at 61-62. Hall "eventually . . . stopped." Id. at 62. Afterwards, M.T. "felt a wet spot" on her leg, but she "wasn't sure what it was." Id. Hall left the bedroom and took a shower. M.T. wiped the wet spot on her leg with some toilet paper, got dressed, including underwear, the black shorts she had been wearing earlier that morning, and sweatpants over the shorts, and she left the apartment.

M.T. went to the office of the apartment complex where she lived and used the telephone there to call Ebony Buckner, A.D.'s best friend. M.T. told Ebony about the rape, and Ebony called A.D. to tell her that she "needed to leave work . . . because something happened to M.T." Id. at 152. When A.D. asked for details, Ebony said that Hall had "[done] something to M.T." Id. at 154. M.T. then called Ebony's sister Ivory Buckner, who subsequently met M.T. at the apartment complex office. As A.D. was driving home, she called Hall and told him what Ebony had told her. Hall denied having done anything to M.T., but he told A.D. that he had been sleeping when "he woke up and M.T. had her arm around him touching him." Id. at 155. Their conversation ended at that point. When A.D. arrived at her apartment complex, she saw Hall driving away.

A.D. found M.T. and Ivory at the apartment complex office, and A.D. took M.T. to the hospital. Caroline Fisher, a sexual assault nurse, interviewed and examined M.T., and Nurse Fisher observed three acute lacerations on M.T.'s genitalia[3] that were consistent with sexual intercourse. Nurse Fisher observed that the lacerations appeared to

---

[3] In his brief on appeal, Hall describes the lacerations as appearing "in M.T.'s vagina[.]" Appellant's Br. at 17. And the State explains that Nurse Fisher observed the lacerations "[i]n her examination of M.T.'s vagina." Appellee's Br. at 4. But Nurse Fisher testified that she did not find any "trauma within the vagina[.]" Tr. at 299. Instead, Nurse Fisher explained that she observed the lacerations in the areas of the "posterior fourchette" and "fossa navicularis." Id. at 287.

3

be "fresh," but she could not determine when they had been inflicted or how they had been inflicted. Id. at 299. Subsequent testing of samples taken during Nurse Fisher's examination of M.T. revealed none of Hall's DNA anywhere on M.T.'s body or in a vaginal wash. And forensic testing revealed none of Hall's DNA on M.T.'s underwear, which she had put on immediately after the rape. But a trace amount of seminal material matching Hall's DNA was found on a cutting of fabric from the crotch of the shorts M.T. was wearing over her underwear after the rape.[4]

The State charged Hall with child molesting, as a Class A felony, and child molesting, as a Class C felony. During the discovery phase of the proceedings, defense counsel took A.D.'s deposition and asked her to elaborate "on a previous statement that [M.T.] had been through [a similar] kind of situation before, and then specifically asked 'what had happened?'" Appellant's App. at 109. A.D. refused to answer, stating that it was "'none of [defense counsel's] business.'" Id. A.D. testified only, "[t]hat's something that happened prior with another child. There was [sic] no charges filed or anything, so that has nothing to do with this." Id. at 113. Defense counsel certified the question and subsequently moved the trial court to compel A.D. to answer the question.

In his motion to compel, defense counsel stated in relevant part that he

would show this Honorable Court that the information requested relates to evidence that the alleged victim may have previously accused another and then recanted, which by itself is highly relevant in a case involving an accusation of improper sexual conduct. Moreover, the defendant would

---

[4] Hall elicited testimony from Shea Anderson, a serologist with the Marion County Crime Lab, that "it would be impossible . . . to tell which side of that fabric the fluid went into or onto[.]" Tr. at 332. In other words, forensic tests could not show whether the seminal fluid had originated from inside or outside of M.T.'s shorts. And Stephanie Goldman, a forensic analyst, testified that the seminal fluid might have been deposited on M.T.'s shorts by "secondary transfer," which "is basically what happens when two things come in contact with a mutual object." Id. at 374.

4

> show the Court that the credibility—or lack thereof—of the complaining witness is of paramount importance to the defendant's theory of defense, and as such, the information sought by the question the deponent refused to answer is critical to the defendant's ability to put forth an effective defense, as is his right.

Id. at 110. After the trial court failed to rule on the motion to compel, defense counsel filed a renewed motion to compel discovery, which the trial court denied.

During trial, outside the presence of the jury, defense counsel made an offer of proof that M.T. had previously made a false accusation of sexual misconduct. After an extensive colloquy, the trial court excluded the proffered evidence. The trial court also excluded from the evidence a phone call between A.D. and Hall, where Hall had asked A.D. for information he could use to impeach M.T. During that call, A.D. told Hall about specific instances where M.T. had lied, including an incident in Kentucky where M.T. "said some boy did something to her," but it turned out to have been consensual. Def.'s Ex. C. And A.D. told Hall that it was "the same f***in' situation" as M.T.'s claims against Hall. Id.

The jury found Hall guilty as charged. The trial court entered judgment of conviction for child molesting, as a Class A felony, and sentenced Hall to thirty-five years, with twenty-five years executed. This appeal ensued.

## DISCUSSION AND DECISION

### Issue One:  Exclusion of Evidence

Hall contends that the trial court abused its discretion when it excluded certain evidence at trial. Our standard of review of a trial court's admission of evidence is an abuse of discretion. Speybroeck v. State, 875 N.E.2d 813, 818 (Ind. Ct. App. 2007). A

5

trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before the court or if the court misapplies the law. See id.

Phone Call

Hall first contends that the trial court abused its discretion when it excluded from the evidence the transcript of a phone call between A.D. and Hall, where A.D. had provided Hall with information he could use to impeach M.T. The phone call included the following relevant excerpt:

> Hall: I'm sittin' here talkin' to my peoples and stuff, and I'm tryin' to, like write everything down that you was sayin' to get my little portfolio strong. And I mean, so give me back all, all of the evidence for, against [M.T.] to make her little statements uncredible [sic]. All that s**t that you was tellin' me about that happened in Kentucky, and all the other little s**t. Talk to me, baby, so I can write this s**t down.
>
> A.D.: . . . [An attorney] was sayin' that you know basically a rape case is [unintelligible] word against word even if there's no evidence. So what you gotta do is like we had already talked about provin' somebody was [unintelligible] reliable. That's what we need to focus on. So gosh, I don't even know where to start.
>
> Hall: Start somewhere.
>
> A.D.: Huh?
>
> Hall: I said, start anywhere, baby. Tell me something.
>
> A.D.: Ok, well, the first thing probably the newest thing that we have on our side is like when [M.T.] lied and said that I hit her. That was proven wrong.
>
> Hall: Okay.
>
> A.D.: When she got arrested, how she was braggin' about what happened. She's been goin' to school, you know, tellin' everybody what happened.
>
> Hall: Alright. Alright, so tell me about this stuff that happened in Kentucky?

6

A.D.: When she said some boys like touched her?

Hall: She said some boy did something to her.

A.D.: Yeah, and it came, found out that it was like a mutual thing. They were experimentin' on one another.

Hall: And she tried to get him locked up for like. . .

A.D.: He was just a little kid. He was her age.

Hall: Oh. He was her age.

A.D.: It wasn't like [unintelligible] an adult or nothin' like that. But I mean still, it's the same f***in' situation.

Hall: Yeah, but she lied and said the little boy did somethin' to her and come to find out, that s**t wasn't even true.

A.D.: Right. And write down about the f***in' dildo [unintelligible] vibrator.

Hall: Mm hmm.

A.D.: Write that down. Call me back. . . .

Def.'s Ex. C.[5]

Hall maintains that, while the phone call between Hall and A.D. regarding M.T.'s lack of credibility was excluded by the trial court's order in limine prohibiting "[a]ny questions, testimony, evidence, or comments concerning any specific acts of dishonesty by any State's witness," Appellant's App. at 149, the State opened the door to that evidence through its questioning of A.D. and Hall. It is well settled that otherwise inadmissible evidence may become admissible where a party "opens the door" to

---

[5] For reasons unknown, the phone call, designated as Defendant's Exhibit C, was not transcribed in the record despite apparently having been played within earshot of the court reporter. In any event, this court was provided with a copy of the recording. Our review of the recording shows that the transcription of the conversation in Hall's brief is accurate, and the State does not dispute the accuracy.

questioning on that evidence.  See Jackson v. State, 728 N.E.2d 147, 152 (Ind. 2000).  Evidence relied upon to "open the door" must leave the trier of fact with a false or misleading impression of the facts related.  Ortiz v. State, 741 N.E.2d 1203, 1208 (Ind. 2001).

Here, Hall contends that the State's questioning of A.D. and Hall regarding their phone call left the jury with a false impression that Hall had been grasping for straws and had a bad motive when he asked A.D. for information he could use to impeach M.T.  In fact, A.D. had previously given such information to Hall, and she repeated that information to Hall during the phone call.

In support of his contention on this issue, Hall directs us to the following colloquy during the State's direct examination of A.D.:

> Q:    What did [Hall] say to you?
>
> A:    He wanted to know information about M.T. that could clear his name.
>
> Q:    How do you mean?
>
> A:    He wanted to know about anything in M.T.'s past, medical records, anything that he could use to get out of his case.

Tr. at 164.  And on cross-examination of A.D., the following colloquy occurred:

> Q:    And when you were asked about a conversation you had with Mr. Hall when he wanted you to help clear his name, do recall talking about that?  Did you actually give him information?
>
> A:    Did I physically give him anything?  No.
>
> Q:    No, did you—because you were having a conversation.  Did you give him any information?
>
> STATE:  Objection; hearsay.  It's not . . .

8

COURT:  Response?

DEFENSE COUNSEL:  I'm asking her if she gave information.  I don't believe that I'm asking for an out of court statement to prove the truth of anything.

COURT:  Alright.  Objection is overruled.

\* \* \*

A:  His request, no.  <u>I didn't give him any information</u>.

\* \* \*

Q:  Is it your testimony here today that that conversation where he wanted to clear his name was one and done, he made a request and you gave him no information and that was the end of the conversation?

A:  He asked me questions.  He basically said, give me information . . .

Tr. at 196-99 (emphasis added).

At that point, the cross-examination stopped and the trial court conducted a lengthy sidebar conference after excusing the jury.  The parties discussed the risk that, in answering the question, A.D. would "go afoul" of the trial court's order in limine excluding "[a]ny questions, testimony, evidence, or comments concerning any specific acts of dishonesty by any State's witness."  Appellant's App. at 149.  In the course of the sidebar conference, the trial court listened to the recording of the phone call.  The trial court ultimately ruled that A.D.'s statements made during the phone call were inadmissible.  And defense counsel did not repeat his question to A.D. about whether she had given Hall any information.  The trial court then warned the State to

> keep in mind if you ask questions on redirect that expand on [the phone call], that does in a sense open the door to things that have not been opened at this point in time which would allow all that to be played.  Because

9

[defense counsel's] not asking that question again, nor is he going to refer to it again.

Tr. at 222.

Nevertheless, on cross-examination of Hall the State questioned him about the phone call with A.D. The following colloquy occurred:

> Q: All right. You placed and recorded a phone call with A.D., is that right?
>
> A: Yes, I did.
>
> Q: All right. And it was A.D. on the other side of the phone, is that right?
>
> A: Yes.
>
> * * *
>
> Q: Okay. And after [exchanging hellos,] you told A.D. that you were attempting to get, quote, your little portfolio together, end quote, for your people, whoever they may be, I don't know, to get your things ready for this, is that right?
>
> A: Yes.
>
> Q: And you were talking about this case.
>
> A: Yes.
>
> Q: And then immediately thereafter you—paraphrasing your view, correct me if I'm wrong, you asked A.D. to give you anything in which you could attack the twelve-year-old's credibility with, is that right?
>
> A: She had already told me—
>
> Q: Hold on Mr. Hall. I asked you a specific question, yes or no.
>
> A: I asked her to give me what she gave me.
>
> Q: I—you asked her—

10

A: Tell me what you told me, that's what I—

Q: You asked her to give you whatever you needed to attack the twelve-year-old's credibility, isn't that right, yes or no, Mr. Hall? Remember the Court's order, yes or no.

A: Yes.

Tr. at 592-93 (emphases added). Then, on re-re-direct examination, defense counsel asked Hall, "in reference to the question the State asked about that conversation with A.D., where you asked A.D. to give you back information—" Id. at 594. But the State objected before defense counsel could finish the question. Following a sidebar conference,[6] the trial court sustained the objection as "outside the scope of the State's question" on cross-examination. Id. at 595.

We agree with Hall that the State opened the door to the admissibility of the phone call. The State's cross-examination of Hall insinuated that he had no basis for asking A.D. questions about M.T.'s credibility, that he had a bad motive in asking those questions, and that his request for information was for naught, all of which was untrue. When the trial court ruled that A.D.'s statements made during the phone call were inadmissible, Hall was denied the opportunity to demonstrate to the jury that A.D. had, in fact, given Hall information relevant to A.D.'s credibility. Indeed, A.D. was allowed not only to stonewall but to give false testimony when she testified that, "I didn't give [Hall] any information." Id. at 199. In essence, the State used the phone call as a sword to attack Hall's credibility, while it simultaneously used the motion in limine as a shield to immunize A.D. from cross-examination, to bolster A.D.'s false testimony, which went to

---

[6] The transcript denotes that much of the sidebar conference was "unintelligible." Tr. at 594.

11

her credibility, and to keep Hall from answering questions to rebut the State's attack. The State cannot have it four ways. The trial court abused its discretion when it excluded the proffered evidence.[7]

Still, a trial court's exclusion of evidence is subject to a harmless error analysis. See Ind. Trial Rule 61. An error is harmless if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties. Gault v. State, 878 N.E.2d 1260, 1267-68 (Ind. 2008). Further, we will find harmless error only if the evidence of guilt is overwhelming and the defendant was allowed to present his defense, even if he did not do so as completely as he desired. Whited v. State, 645 N.E.2d 1138, 1140 (Ind. Ct. App. 1995).

Here, there was some physical evidence to corroborate M.T.'s allegations against Hall, namely, the three acute lacerations Nurse Fisher observed on M.T.'s genitalia and the trace amount of Hall's DNA found on a cutting from the crotch area of M.T.'s shorts. But the State presented evidence only that the lacerations were "consistent with" sexual intercourse, not that they were definitive proof that intercourse had occurred. Tr. at 288. And while the lacerations "appear[ed] to be fresh," Nurse Fisher also testified that she could not determine when or how the lacerations had been inflicted or whether they had been self-inflicted.[8] Id. at 299.

---

[7] As the dissent points out, the trial court offered to play for the jury a redacted version of the phone call, but the court offered to play only the first thirty-four seconds of the call. That portion of the recording included only Hall's statements regarding the information he sought and included none of A.D.'s responses. Thus, the redacted version would have done nothing to resolve the problem the State created when it opened the door to that evidence. Indeed, this proposed solution would have only exacerbated the problems created by the State.

[8] In her telephone conversation with Hall, A.D. twice referred to a vibrator when she gave Hall information that he could use to impeach M.T. A.D. told Hall, "And write down about the f***in' dildo

On the other hand, Hall presented evidence that "it would be impossible . . . to tell which side of [the fabric of M.T.'s shorts] the fluid went into or onto[.]" Id. at 332. In other words, forensic tests could not show whether the seminal fluid found on the shorts had originated from inside or outside of M.T.'s shorts, and a forensic analyst testified that the seminal fluid might have been deposited on M.T.'s shorts by "secondary transfer," which "is basically what happens when two things come in contact with a mutual object." Id. at 374. Hall testified that he and A.D. had recently had sexual intercourse. And M.T. testified that she was wearing those shorts earlier that morning when she had "laid down" on the bed Hall and A.D. shared. Id. at 51. Finally, the forensic analysis of M.T.'s underwear revealed no evidence of Hall's DNA, and the laboratory analysis of the vaginal wash conducted immediately after the rape likewise revealed no evidence of Hall's DNA.

While there is sufficient evidence to support a child molesting conviction, the evidence is not overwhelming. And the question here is not whether the evidence was sufficient, but whether the exclusion of certain evidence was unduly prejudicial to Hall and had a probable impact on the outcome. As Hall's defense depended entirely on the

[unintelligble] vibrator" and told Hall again to, "Write that down." Def.'s Ex. C. These references to a vibrator were excluded when the trial court excluded the telephone conversation. Although apparently not raised to the trial court, M.T's use of a vibrator is potentially admissible exculpatory evidence under an exception to the Rape Shield Statute as a possible explanation for the lacerations other than intercourse with Hall. As we observed in Davis v. State, 749 N.E.2d 552, 556 (Ind. Ct. App. 2001), trans. denied, where the trial court excluded evidence that a twelve-year-old victim had been sexually active, "[w]ithout permitting . . . such exculpatory evidence, the only reasonable inference that the jury could have drawn from the evidence presented, was that [the defendant] was the perpetrator and that [the victim's] accusations were true, because reasonable jurors would not think it typical that a twelve-year-old was sexually active." See also Steward v. State, 636 N.E.2d 143, 149 (Ind. Ct. App. 1994) (holding that the risk of partial corroboration arises when the State introduces evidence of the victim's physical or psychological condition to prove that sexual contact occurred and, by implication, that the defendant was the perpetrator), summarily aff'd in relevant part, 652 N.E.2d 490 (Ind. 1995). Here, likewise, reasonable jurors would not think it typical that a twelve-year-old's genital lacerations might have been self-inflicted from the use of a vibrator.

13

jury crediting his version of events over M.T.'s, the trial court's erroneous exclusion of Hall's phone call with A.D. resulted in substantial prejudice to Hall. See, e.g., Thompson v. State, ___ N.E.3d ___, No. 45A03-1401-CR-8, slip op. at 10 (Ind. Ct. App. August 29, 2014) (holding Rule 404(b) error not harmless, despite victim's escape from defendant's van to report rape to police officer directing traffic and rape kit which revealed presence of defendant's semen, where defendant's defense "hinged solely on the credibility" of the victim). Again, the State was allowed to leave the jurors with the false impression that Hall attempted to get whatever he needed to attack M.T.'s credibility for no reason other than to fabricate a defense while also bolstering A.D.'s false testimony. We hold that the trial court's erroneous exclusion of the phone call, after the State had opened the door to that evidence, was not harmless error, and we reverse Hall's conviction. Because Hall raises two other issues that are likely to recur in a new trial, we address them here.

M.T.'s Reputation for Untruthfulness in Her Community

Hall next contends that the trial court abused its discretion when it excluded proffered testimony regarding M.T.'s reputation for untruthfulness in her community. Indiana Evidence Rule 608(a) allows, under limited circumstances, the credibility of a witness to be attacked by opinion or reputation evidence. Norton v. State, 785 N.E.2d 625, 629 (Ind. Ct. App. 2003). The Rule provides:

> The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

14

Evid. R. 608(a).[9]  "Like most jurisdictions, Indiana requires that an impeaching witness speak only about the impeachee's reputation within the 'community' at the time of the impeachee's testimony or within a reasonable time prior to trial."  Norton, 785 N.E.2d at 629 (citing 13 Robert Lowell Miller, Jr., Indiana Evidence § 608.103 (2d ed. 1995)).

In Norton, the trial court excluded the defendant's proffered evidence that the State's witness had a reputation for untruthfulness among the witness's family.  On appeal, we adopted the reasoning of the Maine Supreme Judicial Court in State v. Ricker, 770 A.2d 1021, 1024 (Me. 2001), which held in relevant part as follows:

> To be admissible, the evidence concerning a witness' reputation for truthfulness "must embody the collective judgment of the community and be derived from a group whose size constitutes an indicium of inherent reliability."  State v. Mazerolle, 614 A.2d 68, 73 (Me. 1992) (quotation marks and citations omitted).  Evidence of reputation is considered reliable only if the community holding the opinion of reputation is sufficiently large. Id.  If the group is too insular, its opinion of the witness' reputation for truthfulness may not be reliable because it may have been formed with the same set of biases.  State v. Cyr, 767 A.2d 307, 310 (Me. 2001).
>
> While it may be that a child's community is smaller than an adult's community, the child's community must be sufficiently numerous for the opinion of reputation to be reliable, and the members of that community must have had sufficient contacts with the child to justify an opinion of reputation.

785 N.E.2d at 631.  And, in Norton, we held as follows:

> [W]e are asked to determine whether a "family" is large enough to constitute a community for purposes of Evidence Rule 608(a).  We note that the nature of the community for purposes of 608(a) is not limited to the community at large.  Some groups may be sufficiently large to provide the requisite reliability, while others may not.  There may be cases where the community of one's family is deemed to be of sufficient size to provide the requisite reliability for an impeaching witness's testimony.  However, we are not the proper arbiter of such decisions in the first instance.  Trial courts

---

[9]  This rule was amended effective January 1, 2014, but that amendment is not relevant here.

are in a far better position to decide whether the foundational requirements for the admissibility of impeachment evidence have been met given the discretion they possess concerning evidentiary matters, the gatekeeping role they serve, and their unique ability to judge the credibility of the witnesses.

Given our deferential standard of review, we cannot say that the trial court erred in disallowing the impeachment testimony. There was no evidence presented as to the size of the [witness's] family. Further, the trial court was in a better position to observe the character and demeanor of . . . [the] impeachment witness and to make the ultimate decision concerning reliability of the testimony. The trial court did not abuse its discretion in deciding that this family group did not amount to a substantial community of persons for purposes of Evidence Rule 608(a).

785 N.E.2d at 631-32.

Here, in an attempt to establish a foundation for the reputation testimony outside the presence of the jury, Hall presented testimony from Corrine Buckner, a family friend, as follows:

Q: How are you familiar with M.T.?

A: I've known her since she was a baby, like around two [years old]. I've known her mom for a really long time.

Q: You've known both M.T. and her mom for a long time?

A: Yes.

Q: Did you ever live around M.T.?

A: When she was younger she lived with us, her and her mom.

Q: And did you have an opportunity to interact with her even after she was not living with you?

A: Yes, I still interact with her.

Q: How frequently do you interact with her?

A: It's actually been a couple [of] months since I've interacted with her recently, but before that she was at my house like every weekend.

16

Q:     Every weekend?  Okay.  Are you related to M.T.?

A:     Not by blood.

Q:     The familiarity you have with M.T. and her mom, is that shared by any other persons in your family?

A:     Yeah.  All of my close family, both of my sisters, my little brother, and my mom.

Q:     And how many people are you talking about—your family and your close friends—how many people are you talking about here?

A:     That know her or that, like—

Q:     That are familiar with her?

A:     Almost everybody around me is familiar with her because of her being at my house, like almost every weekend, like all my friends and stuff, but I don't know exactly how—like a number.

Q:     A number?  That's fine.  Do—is any other member—I know that would be weird, but is any other member of your family or people that are close to you, are any of them related by blood to M.T.?

A:     No.

* * *

Q:     Okay.  And outside of yourself and your own personal opinion, do you know if M.T. has a reputation with all of these other people, your sisters, any other family members that you're mentioning?

A:     Yes.

* * *

Q:     And can you identify or name some of these people?  You've been mentioning it's your family.  Can you identify some of these people?

A:     Ebony, Ivory, Kenny, Patty.  You want me to name my friends too that know her or—

Q:     Just the ones that know her reputation, that you know that they know her reputation.

17

A:      Jessica, Jasmine, Mariah, Mikey.

* * *

Q:      Okay.  And is there a general reputation amongst all of these people as to M.T.'s reputation for being truthful or not truthful?

A:      Yeah.

Tr. at 417-20.  The State then questioned Corrine, and she identified another friend named Ashley who knew M.T., and Corrine also explained that M.T.'s reputation was based on the community's interactions with M.T. both in Corrine's home and "around the neighborhood period."  Id. at 423.

In excluding the proffered testimony, the trial court ruled in relevant part as follows:

> Evidence of reputation is considered reliable only if the community holding the reputation is sufficiently large.  And specifically, if the group is too insular, its opinion of the witness's reputation for truthfulness may not be reliable because it has been formed with the same set of biases.  The Norton case goes on to say:  While it may be that a child's community is smaller than an adult's community, the child's community must be sufficiently numerous for the opinion of the reputation to be reliable and the members of that community must have had sufficient contacts with the child to justify an opinion of reputation.  What's been presented here is that the community that exists existed between approximately eight people at this point in time and those eight people had experiences with M.T. in two locations—at least two locations in the house—these being houses.  I happen to think, after listening to the foundation that's been given by this witness, and everything else that I've heard in this trial as to the other witnesses who would provide this reputation evidence, that this group is too insular and the fact that this occurred in two locales, that any reputation testimony that would be given and the opinion about the witness's reputation for truthfulness is not reliable because it would have been based off of the same set of biases.

18

Id. at 429-30. Hall then made an offer of proof with Corrine's testimony that M.T. had a reputation in the community of "not [being] very truthful" about "[p]robably everything." Id. at 433, 435.

Hall maintains that the trial court erred in excluding the proffered testimony for two reasons, namely: the court identified the community as consisting of "approximately eight people" when Corrine identified eleven people in the community, including herself and A.D.; and the court identified two locations where the community interacted with M.T., but Corrine also testified that interactions occurred in the neighborhood. Id. at 429. And Hall contends that the trial court's reliance on Norton is misplaced because this case is distinguishable from Norton. In particular, Hall contends that, unlike the community in Norton, which was made up of mostly the impeachee's family members, the community described by Corrine only includes one of M.T.'s family members.

But we cannot say that the trial court abused its discretion when it found that the community described by Corrine was too insular. Three of the members of the community Corrine described were either family (A.D.) or like family (M.T. referred to Ebony and Ivory as Aunt Ebony and Aunt Ivory). Corrine explained that the community's interactions with M.T. mostly occurred at Corrine's house on the weekends. While she subsequently added that M.T.'s reputation was based on the community's interactions "around the neighborhood," she did not describe those interactions outside of her home with any specificity. Id. at 423. Further, four members of the community are related to Corrine, and the others are Corrine's friends, which bolsters the trial court's assessment that the community's opinion is based on the same set of biases. Given our

19

deferential standard of review, we cannot say that the trial court abused its discretion when it excluded the proffered evidence of M.T.'s untruthfulness in the community.

### Issue Two:  Motion to Compel Discovery

Finally, Hall contends that the trial court abused its discretion when it denied his motion to compel A.D. to answer a deposition question about an alleged prior false accusation of sexual misconduct made by M.T., namely, the Kentucky incident mentioned by A.D. in her recorded phone call with Hall.  In Walton v. State, 715 N.E.2d 824, 827 (Ind. 1999), our supreme court held as follows:

> A defendant's Sixth Amendment right of confrontation requires that the defendant be afforded an opportunity to conduct effective cross-examination of State witnesses in order to test their believability.  Davis v. Alaska, 415 U.S. 308, 315-18 (1974); Timberlake v. State, 690 N.E.2d 243, 255 (Ind. 1997), cert. denied, 525 U.S. 1073 (1999)[;] Coates v. State, 534 N.E.2d 1087, 1095 (Ind. 1989).  "The right to cross-examine, as well as other forms of confrontation, 'ensure that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings.'"  Tague v. Richards, 3 F.3d 1133, 1138 (7th Cir. 1993) (quoting Maryland v. Craig, 497 U.S. 836, 846 (1990)).  Accordingly, the majority of jurisdictions that have considered the question—including Indiana cases decided before the adoption of the Rules of Evidence—have held that the evidentiary rule preventing evidence of specific acts of untruthfulness must yield to the defendant's Sixth Amendment right of confrontation and right to present a full defense.[]  Finding both the reasoning and weight of this authority persuasive, we hold that evidence of prior false accusations of rape is admissible to attack the credibility of the accusing witness, notwithstanding the general exclusionary edict of [Evidence] Rule 608(b).

(Alteration and footnote omitted).  And the court further held that evidence of prior false accusations of rape may be admitted if (1) the complaining witness admits he or she made a prior false accusation of rape; or (2) the prior accusation is demonstrably false. Id. at 828.  While the holding in Walton refers to prior false accusations of rape

specifically, our supreme court relied in relevant part on <u>Little v. State</u>, 413 N.E.2d 639, 643 (Ind. Ct. App. 1980), where we held that "evidence of false accusations of similar <u>sexual misconduct</u> is admissible on the issue of the victim's credibility." (Emphasis added). The <u>Walton</u> holding is not limited to prior false accusations of rape but also includes prior false accusations of similar sexual misconduct.

Hall maintains that, according to A.D., M.T. had made a prior false accusation of sexual misconduct, which would be relevant to M.T.'s credibility and admissible as an exception to Evidence Rule 608(b) under <u>Walton</u>. While A.D. was general in her remarks to Hall in the phone call, she stated that M.T. had "lied and said [a] little boy did somethin' to her and come to find out, that s**t wasn't even true." Def.'s Ex. C. And A.D. told Hall that it was the "same situation" as Hall's situation.[10] <u>Id.</u> But, when she was later deposed by Hall's counsel, A.D. refused to discuss the incident in detail, and Hall moved to compel her to answer his request for more specific information, which the trial court denied.

We hold that the trial court abused its discretion when it denied Hall's motion to compel.[11] Trial Rule 26 (B)(1) provides in relevant part that

> [p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject-matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party. . . . It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

---

[10] To be sure, this is not a statement of an ultimate fact or a legal conclusion.

[11] We reject the State's contention that Hall did not "make a proper offer of proof at trial" and has waived this issue for our review. Appellee's Br. at 17.

21

A.D. did not assert that the information sought was privileged or subject to protection, and it was clearly relevant to Hall's defense in that it bears directly on M.T.'s credibility. See Ind. Trial Rule 26(B). On remand, the trial court shall grant Hall's motion to compel.[12]

We note that, during Hall's offer of proof on this issue, the trial court apparently misunderstood Hall's argument with regard to the potential admissibility of the evidence sought in his motion to compel. The trial court found that, unless Hall was willing to admit that he and M.T. had had consensual sex, then the incident in Kentucky was not similar to M.T.'s claims against Hall. In particular, the following colloquy occurred:

> DEFENSE COUNSEL: She also said it's the same situation as this—
>
> COURT: Except it wasn't—
>
> DEFENSE COUNSEL: —the same situation—
>
> COURT: —the same situation as this. She said that that was consensual. Unless you're ready to claim that this situation actually happened and it was consensual, it's not the same situation.

Tr. at 476-77. And the court went on to conclude that the purported evidence did not even suggest that a prior false accusation had been made:

> COURT: But there wasn't –but here's what I'm saying: There was sexual conduct in that particular case. I mean, she says it here that there was something with a boy. It wasn't a false allegation. And again, you have to show that the false allegation is true—I mean, I understand it's sort of a circular argument, but it's true—

---

[12] We disagree with the dissent's conclusion that "it became clear at trial that M.T. did not make a demonstrably false prior accusation of similar sexual misconduct and therefore the Kentucky incident is inadmissible." The prosecutor's "offer of proof" as to what acts the Kentucky incident did or did not consist of is not evidence and does not resolve the issue of whether any evidence obtained on remand will be admissible on retrial.

22

DEFENSE COUNSEL: Judge—

COURT: —you can't get past the rape shield [statute] without showing there's a false allegation and what you're showing me, at least the evidence presented here is that it wasn't truly a false allegation. Something did occur—

DEFENSE COUNSEL: But the accusation—

COURT: —which is past sexual conduct which is barred by the Rape Shield [Act].

DEFENSE COUNSEL: The allegation could have been of rape, not consensual sexual conduct and that would have been a false statement according to the—

COURT: No.

DEFENSE COUNSEL: —to the tape and Judge, again, if we would have been able to inquire further into this after the deposition we would not even have this situation right now but we were barred from doing so.

Id. at 478-79 (emphases added).

Contrary to the trial court's analysis, A.D.'s statements in her phone call with Hall indicate that M.T. had made a prior false allegation of sexual misconduct which may, depending on the evidence obtained through further discovery, be admissible under Walton.[13] No Indiana court has addressed the "similar sexual misconduct" requirement under Little, but similar does not mean identical. Here, if Hall discovers evidence to confirm, for example, that M.T. had previously made a demonstrably false accusation of

---

[13] To be clear, the admissibility of this evidence, as distinct from the transcript of the phone call between Hall and A.D., which included a reference to the prior false accusation, is not dependent on the State's opening the door to its admissibility. Rather, should Hall obtain more information about M.T.'s prior accusation, in order to establish its admissibility at trial he must show that M.T. made a prior accusation of similar sexual misconduct and either that M.T. has admitted that it was false or that it was demonstrably false. See Walton, 715 N.E.2d at 828. Whether further development of the facts will allow Hall to meet that standard remains to be seen, but the trial court erred when it categorically denied him the opportunity to develop the facts.

similar sexual misconduct, it would be admissible on the issue of M.T.'s credibility regardless of whether M.T. ultimately conceded that she engaged in a consensual sexual act with the boy in Kentucky. See id. As we stated in Little, "[t]he focus is the falsity of the accusations." 413 N.E.2d at 643.

## Conclusion

The trial court abused its discretion when it excluded from the evidence the phone call between Hall and A.D. regarding M.T.'s credibility after the State opened the door to that evidence. Because the trial court's error was not harmless, we reverse Hall's conviction. And because two other issues are likely to recur during a new trial, we also hold that the trial court did not abuse its discretion when it excluded evidence of M.T.'s reputation for untruthfulness in the community, but that the trial court abused its discretion when it denied Hall's motion to compel A.D. to answer the deposition question regarding M.T.'s prior false accusation of sexual misconduct.

Reversed and remanded for a new trial.

BROWN, J., concurs.

VAIDIK, C.J., dissents in part and concurs in part with separate opinion.

24

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MARQ HALL, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A05-1312-CR-614 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

**VAIDIK, Chief Judge, dissenting in part, concurring in part.**

I respectfully disagree with the majority's decision to reverse Hall's Class A felony child-molesting conviction. First, I agree with the majority that the trial court properly excluded the evidence of M.T.'s reputation for untruthfulness in her community and that the trial court should have granted Hall's motion to compel A.D. to answer the deposition question about M.T.'s alleged prior false allegation of sexual misconduct with a boy in Kentucky. However, I disagree that the contents of A.D.'s entire phone call with Hall should be admitted. In any event, I believe that any error by the trial court in excluding the phone call was harmless and would therefore affirm Hall's conviction for Class A felony child molesting.

The record shows the following evidence supporting Hall's conviction for Class A felony child molesting:

25

- M.T. testified that Hall rubbed his penis on the crotch area of her shorts and then had sexual intercourse with her on his bed.

- Twelve-year-old M.T. reported the incident that same day.

- M.T. went to the hospital and was examined by a sexual-assault nurse.

- During the vaginal exam, the nurse found three "fresh" lacerations that were consistent with penetration.

- Hall's seminal material was found on the crotch of M.T.'s shorts.

- Hall admitted that he was in bed with M.T. at the relevant time, but he said he woke up to M.T. touching his penis.

- Once Hall was charged in this case, he was a fugitive for three months and even left the state.

After the molestation, Hall called A.D. on the phone to go over information he could use to attack M.T.'s credibility, specifically information about M.T.'s alleged prior false allegation of sexual misconduct with a boy in Kentucky. Hall was vaguely familiar with the incident because of his relationship with A.D., but he wanted more details from A.D. The phone call contained some information about the Kentucky incident. Expanding on this inquiry, defense counsel, during A.D.'s deposition, asked her a question about the Kentucky incident, but A.D. refused to answer the question. Defense counsel asked the trial court to compel A.D. to answer the question, but the trial court denied counsel's motion.

At trial, the following colloquy occurred between defense counsel and A.D. regarding Hall's phone call to A.D.:

26

Q      And when you were asked about a conversation you had with Mr. Hall when he wanted you to help clear his name, do you recall talking about that?  Did you actually give him information?

A      Did I physically give him anything?  No.

Q      No, did you – because you were having a conversation.  Did you give him any information?

Tr. p. 196-97.  At this point, the State objected on hearsay grounds.  The trial court instructed A.D. that she could not give the substance of her conversation with Hall, but she could answer yes or no.  So the questioning continued as follows:

Q      When Mr. Hall was talking to you about clearing his name, did you give him any information?

A      Did I give him an[y] information – he asked me—

* * * * *

A      --- for the information

**THE COURT:**      Not what that information was.  The question was did you give him any information based on his request for it.

A      *His request, no.  I didn't give him any information*.

**THE COURT:**      Alright.

Q      Is it your testimony today that that conversation was one and done request, hang up?

A      I'm sorry?

Q      Is it your testimony here today that that conversation where he wanted to clear his name was one and done, he made a request and you gave him no information and that was the end of the conversation?

A      He asked me questions.  He – he basically said give me information –

*Id.* at 198-99 (emphasis added).  At this point, the trial court excused the jury and reminded A.D. not to violate the court's order in limine, which prohibited the witnesses from testifying about, among other things, any sexual history of M.T. or uncharged prior

27

acts or bad acts of M.T. *Id.* at 200-02; *see also* Appellant's App. p. 149-51 ("Any questions, testimony, evidence, argument, or comments regarding prior sexual conduct of any State's witness, including but not limited to [M.T.]. I.R.E. 412."). Again, the court told A.D. that she could answer defense counsel's question with a "yes" or "no"; however, she could not expand on what was said during the phone call with Hall. Tr. p. 202. The court said that regardless of A.D.'s answer, defense counsel could not "kick [his] own door open" to impeach A.D. with the substance of the phone call, which included the Kentucky incident. *Id.* at 203. The court then excused A.D. from the courtroom in order to listen to the phone call.

The trial court acknowledged that the phone call might impeach A.D.; however, the court warned defense counsel that the phone call might also hurt Hall in the process because Hall called the victim's mother and asked her, "hey, how can we essentially tear down the credibility of a twelve year old girl." *Id.* at 210, 211. Before taking a break so that defense counsel could make a decision, the trial court told defense counsel what its ruling would be:

> I can tell you this: The phone call as it is, the whole phone call, my ruling is going to be that it can't come in. If you want to redact part of that phone call I've shown you where it can be redacted to. That's it.

*Id.* at 218. The court elaborated that it would play the phone call up to the thirty-fourth second, which was before A.D. and Hall discussed the Kentucky incident. *Id.* at 220. After defense counsel deliberated with each other, they decided not to ask A.D. the question again. *Id.*

However, the issue of the phone call resurfaced during the State's re-cross-examination of Hall:

> Q     [C]orrect me if I'm wrong, you asked A.D. to give you anything in which you could attack the twelve year old's credibility with, is that right?
>
> A     She had already told me ---
>
> Q     Hold on, Mr. Hall. I asked you a specific question, yes or no.
>
> A     I asked her to give me what she gave me.
>
> Q     I – you asked her –
>
> A     Tell me what you told me, that's what I –
>
> Q     You asked her to give you whatever you needed to attack the twelve year old's credibility, isn't that right, yes or no, Mr. Hall? Remember the Court's order, yes or no.
>
> A     Yes.
>
> Q     Thank you, Mr. Hall.
>
> A     You welcome.
>
> Q     And only after you retained your attorney and gotten your little portfolio together and returned to Indiana, only then did you present yourself to this Court.
>
> A     I never got a portfolio ready.
>
> Q     Okay. But only then you presented yourself to this Court, is that right?
>
> A     Only – nope, it was more things before that. Would you like to know those things?
>
> Q     Mr. Hall, I'm the one asking the questions but I am finished, thank you.

*Id.* at 593. When defense counsel attempted to ask Hall a question on re-redirect about the phone call when Hall asked A.D. to "give [him] *back* information" about M.T., *id.* at 594 (emphasis added), the State objected, and a sidebar conference was held. Although most of the conference is unintelligible, it appears that defense counsel believed that his line of questioning was permissible because Hall "said give *back* [the information] and [there's] a difference between give first or . . . get information again." *Id.* at 594-95 (emphasis added). The State disagreed, believing that the distinction did not matter. *See id.* at 595 ("Except if [Hall] had [the information about M.T.] already why would he need

29

it again. That's absurd."). The trial court sustained the State's objection as outside the scope of the State's question and going too close to the court's order in limine. *Id.*

The majority reverses Hall's conviction solely because of the trial court's exclusion of the phone call.[14] The majority finds that the State's re-cross-examination of Hall opened the door to the admissibility of the entire phone call, including the Kentucky incident, because it "insinuated that [Hall] had no basis for asking A.D. questions about M.T.'s credibility, that he had a bad motive in asking those questions, and that his request for information was for naught, all of which was untrue." Slip op. at 11. However, the majority overestimates the value of the phone call and its possible impact on the verdict. Defense counsel argued at trial that the value of the phone call was to show that Hall had a basis for asking A.D. the questions because he had learned certain information about M.T. from A.D. before the phone call.[15] I agree with the State that the distinction of whether Hall heard this information first during the phone call or earlier is a distinction without a difference and certainly not reversible error given the overwhelming evidence in the case.

What is left unwritten in the majority's opinion, at least explicitly, is its concern that the trial court excluded evidence that (1) M.T. made a prior false allegation of sexual

---

[14] I agree with the majority's conclusion that the trial court properly excluded the evidence of M.T.'s reputation for untruthfulness in her community because the community was too small.

[15] The majority states that defense counsel argued at trial that the phone call was to impeach A.D. I read the record differently. During cross-examination of the mother, defense counsel attempted to admit the phone call. However, after the trial-court judge warned counsel that admission of the phone call might make matters worse for the defense, defense counsel reconsidered and did not pursue his objection. This matter came to a head again during the re-redirect of Hall. At this time, defense counsel preserved its objection, citing the reason for the admission of the phone call was to show that Hall knew this information before he called A.D. that day.

misconduct and (2) M.T.'s mother, at least on the occasion of the telephone conversation to her then-boyfriend, Hall, said that at some unspecified time M.T. used a dildo.

With regard to the alleged prior false allegation of sexual misconduct with the boy in Kentucky, I agree with the majority that the trial court should have allowed defense counsel to ask A.D. about this allegation during A.D.'s deposition. But it did not and, in any event, the error was harmless. At trial, the prosecutor, as an officer of the court, explained that when A.D. and M.T. lived in Kentucky with A.D.'s friend and M.T. was nine years old, A.D.'s friend asked M.T. if she had ever been touched, and M.T. said yes, which undisputedly she had. A.D.'s friend alerted the Kentucky equivalent of the Department of Child Services, M.T. was interviewed, and it was learned that it was mutual touching. During trial, defense counsel had an opportunity to ask A.D. questions to establish his offer of proof, but he did not. As such, he has waived this issue. Besides, if there is fire to this smoke, undoubtedly it will be the subject of post-conviction relief, in particular Post-Conviction Rule 1(a)(4), which allows relief if there exists "evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice." We should not jump to the conclusion that this incident is admissible. Making young M.T. endure another trial before knowing if this qualifies as an admissible false allegation under the Rape Shield Statute is unnecessary.

The same is true about M.T.'s alleged use of a dildo. First, I note that Hall did not pursue any information about this through the discovery process and never made an allegation throughout the entire underlying proceedings or on appeal that there was

31

anything to this allegation. Yet sprinkled throughout the majority's opinion are references to the mother's comment in the telephone conversation, the forensic nurse's comment that the "fresh" lacerations were only "consistent with" sexual intercourse (as if a nurse or doctor could testify to anything other than that lacerations were consistent with intercourse), and defense counsel's cross-examination question to the nurse as to whether the "fresh" lacerations could have been self-inflicted, which are then turned into enough doubt to find that the evidence here is not overwhelming. Importantly, there is nothing in the record, other than what has been ad nauseam described in the phone call, to confirm any use of a dildo by M.T. or when, where, or what kind was allegedly used. And most importantly, Hall never argues on appeal that he was denied the opportunity to question about this nor that this should have been admitted as evidence of an exception to the Rape Shield Statute. Inexplicably, however, the majority in footnote 8 explains extensively that on retrial this unknown incident(s) may be admissible under the Rape Shield Statute.

Reading between the lines here, this reversal is not about whether a false impression was created concerning whether Hall in his phone call for the first time or second time asked A.D. about M.T.'s past. The State did not make any argument about the phone call during its closing argument. Instead, this reversal is about smoke with no fire in the midst of overwhelming evidence of Hall's guilt.[16] If there is fire, our criminal-justice system provides a remedy through post-conviction relief.

---

[16] The majority cites this Court's recent opinion in *Thompson v. State*, ___ N.E.3d ___, No. 45A03-1401-CR-8, slip op. at 10 (Ind. Ct. App. Aug. 29, 2014), for the proposition that Hall's defense depended entirely on the jury crediting his version of events over M.T.'s. Here, however, there was other evidence to support M.T.'s story: Hall's seminal material was found on the crotch of M.T.'s shorts, M.T. had three "fresh" lacerations, Hall admitted that he was in bed with M.T. and that she touched his penis, and Hall was a fugitive for three months.