ATTORNEYS FOR APPELLANT
Valerie K. Boots
Ruth A. Johnson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Michael G. Worden
Chandra K. Hein
Deputy Attorneys General
Indianapolis, Indiana



# In the
# Indiana Supreme Court

### No. 49S05-1412-CR-728

MARQ HALL,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below)*

Appeal from the Marion Superior Court, No. 49G02-1210-FA-68981
The Honorable Marc T. Rothenberg, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 49A05-1312-CR-614

**July 2, 2015**

**David, Justice.**

Following a jury trial, Marq Hall was convicted of class A felony child molesting. On appeal, he claimed that the trial court erred in denying his motion to compel the victim's mother to answer a deposition question about an incident in the victim's past and in excluding from evidence a phone conversation with the victim's mother in which they discussed the incident.

Finding that the trial court abused its discretion in both instances, the Court of Appeals reversed Hall's conviction and remanded for a new trial. However, our review of the evidence, construed in a light most favorable to the conviction, leads us to conclude that the two errors, even if considered violations of Hall's Sixth Amendment right to confront witnesses against him, were harmless beyond a reasonable doubt. We accordingly affirm Hall's conviction.

**Facts and Procedural History**

In September of 2012, Marq Hall was living in an Indianapolis apartment with his girlfriend A.D. and her twelve-year-old daughter M.T. Hall and A.D. had very recently decided to end their relationship after a few months together. On September 19th, Hall and A.D. were in the process of splitting up, but Hall was still residing in A.D.'s apartment. That afternoon, he was home alone with M.T. Hall approached M.T. from behind and rubbed his penis on her buttocks, which were covered by her gym shorts, for a couple of minutes. He then pulled down her shorts and underwear, pinned her to a bed, and forced her to have sexual intercourse with him.

When the ordeal was over, M.T. felt a wet spot on her leg. She promptly wiped the spot with toilet paper.

Minutes after the rape, Hall took a shower. While he was in the shower, M.T. put the same clothes she had been wearing back on and fled the apartment. Feeling very emotional and unsure of what to do next, M.T. headed to the apartment complex's leasing office, where she asked property manager Sonja Cumberlander if she could use the phone. Cumberlander observed that the girl appeared "very excited" and nervous. (Tr. at 119.)

After arriving at the office, M.T. immediately phoned a friend of her mother's and reported the rape and molestation. When A.D.'s friend told her that Hall had "[done] something to M.T.," (Tr. at 154), A.D. immediately left work and, as she drove to her apartment, called Hall. Hall denied having done anything to M.T. but told A.D. that he had been "asleep in the bed and he woke up and M.T. had her arm around him touching him." (Tr. at 155.) When A.D. arrived at the

2

apartment complex, Hall saw A.D. but drove right past her and out of the complex without stopping. As M.T. observed Hall drive by the building, she exclaimed, "Oh my God, oh my God, there he is." (Tr. at 120.)

A.D. entered the office and observed her daughter, who appeared "hysterical" and was crying and unable to speak. (Tr. at 158.) She would later testify that "I've never seen her that upset." (Tr. at 159.) After M.T. told her that Hall had raped her, A.D. immediately took M.T. to the hospital, where sexual assault nurse Caroline Fisher observed three fresh lacerations to the girl's vaginal area that were consistent with penetration. Though subsequent testing of samples from the examination did not reveal Hall's DNA on M.T.'s body or underwear, a trace amount of Hall's semen was found on the crotch of the shorts M.T. was wearing during the incident.

The State charged Hall with class A felony child molesting[1] and class C felony child molesting.[2] After charges were filed, Hall remained a fugitive for three months, at one point fleeing the state, before surrendering to authorities.

Once discovery began, Hall conducted a deposition of A.D. He asked A.D. to elaborate on a previous statement she had made about M.T., specifically about "what happened before." (App. at 113.) This was seemingly a reference to an incident that occurred when M.T. was nine years old and living in Kentucky with A.D.[3] One of A.D.'s friends had asked M.T. if she had ever been touched, and M.T. responded that she had. The Kentucky equivalent of the Department of Child

---

[1] Indiana Code § 35-42-4-3(a)(1) (2008).

[2] Indiana Code § 35-42-4-3(b) (2008).

[3] Acting as an officer of the court, the prosecutor provided this information to the trial court at trial and outside of the jury's presence. He had obtained the information from conducting two pre-trial interviews. But at the time of the deposition, the extent of Hall's knowledge about this incident is unknown.

Services then interviewed the girl. During the interview, M.T. revealed that the touching had been consensual with a boy her age. Nothing more came of the incident.

In response to Hall's deposition question, A.D. stated, "Well, that really don't have anything to do with this, so I won't answer that question because that's already been handled. No charges were filed because nothing took place. That's really all you need to know on that." (App. at 113.) Hall then asked, "What had happened?" and A.D. repeated that "I just told you that that's really none of your business. That's something that happened prior with another child. There was no charges filed or anything, so that has nothing to do with this." (App. at 113.)

Hall then certified the question and filed a motion to compel discovery in which he asked the trial court to order A.D. to answer the question, as he believed "the information requested relates to evidence that the alleged victim may have previously accused another and then recanted, which by itself is highly relevant in a case involving an accusation of improper sexual conduct." (App. at 109–110.) A few months later he renewed his motion, which the trial court denied.

The day Hall's jury trial began, the trial court granted the State's motion in limine as to, among other things, "[a]ny questions, testimony, evidence, argument, or comments regarding prior sexual conduct of any State's witnesses, including but not limited to [M.T.]," pursuant to Indiana Evidence Rule 412. (App. at 149–50.) Also known as the Rape Shield Rule, Rule 412 prohibits, subject to listed exceptions like a prior false accusation, the admission into evidence in a civil or criminal proceeding involving alleged sexual misconduct evidence offered to prove a victim's prior sexual behavior or sexual predisposition.

During trial and outside the presence of the jury, Hall made an offer of proof that he intended to inquire into what he characterized as a prior false accusation by M.T.—the Kentucky incident—as an exception to the Rape Shield Rule. Finding that M.T.'s report of consensual touching "wasn't a false allegation," the trial court excluded the proffered evidence. (Tr. at 477, 484–85.) Thus, during the testimony of M.T. and A.D., the Kentucky incident was off limits as inadmissible evidence, but the topic would soon return.

4

On the second day of Hall's trial, the State called A.D. to the stand. After having A.D. recount the events of September 19th, the prosecutor asked her about a phone call with Hall that occurred shortly after M.T.'s rape and molestation:

> Q: [W]hat did Marq say to you?
>
> A: He wanted to know information about M.T. that could clear his name.
>
> Q: How do you mean?
>
> A: He wanted to know about anything in M.T.'s past, medical records, anything that he could use to get out of his case.

(Tr. at 163–64.)

Then on cross examination of A.D., the following exchange occurred between A.D. and Hall's counsel:

> Q: And when you were asked about a conversation you had with Mr. Hall when he wanted you to help clear his name, do you recall talking about that? Did you actually give him information?
>
> A: Did I physically give him anything? No.
>
> Q: No, did you—because you were having a conversation. Did you give him any information?

(Tr. at 196–97.) At this time, the prosecutor objected, contending among other things that A.D.'s answer would violate the motion in limine. The trial court then instructed A.D. to answer either yes or no, and Hall's counsel repeated the question. A.D. responded:

> A: His request, no. *I didn't give him any information.*
>
> . . .
>
> Q: Is it your testimony here today that that conversation where he wanted to clear his name was one and done, he made a request and

5

you gave him no information and that was the end of the conversation?

A: He asked me questions. He . . . basically said give me information . . .

(Tr. at 199) (emphasis added).

Once more, the prosecutor voiced his concern that A.D. would run afoul of the order in limine. The trial court then dismissed the jury from the courtroom, and the parties further discussed the risk that A.D. would, in answering the question, violate the order in limine when discussing her conversation with Hall. Upon the trial court's request, a recording of the phone call was played.[4] The approximately four-minute-long recording contained the following relevant excerpt:

> Hall: I'm sittin' here talkin' to my peoples and stuff, and I'm tryin' to, like write everything down that you was sayin' to get my little portfolio strong. And I mean, so give me back all, all of the evidence for, against [M.T.] to make her little statements uncredible. All that s**t that you was tellin' me about that happened in Kentucky, and all the other little s**t. Talk to me, baby, so I can write this s**t down.
>
> A.D.: . . . [An attorney] was sayin' that you know basically a rape case is . . . word against word even if there's no evidence. So what you gotta do is like we had already talked about provin' somebody was [unintelligible] reliable. That's what we need to focus on. So gosh, I don't even know where to start.
>
> . . .
>
> Hall: Alright, so tell me about this stuff that happened in Kentucky?
>
> A.D.: When she said some boys like touched her?

_____

[4] It was marked as Defense Exhibit C but was not entered into evidence.

Hall: She said some boy did something to her.

A.D.: Yeah, and it came, found out that it was like a mutual thing. They were experimentin' on one another.

Hall: And she tried to get him locked up for like . . .

A.D.: He was just a little kid. He was her age.

Hall: Oh. He was her age.

A.D.: It wasn't like [unintelligible] an adult or nothin' like that. But I mean still, it's the same f****n' situation.

Hall: Yeah, but she lied and said the little boy did somethin' to her and come to find out, that s**t wasn't even true.

A.D.: Right.

(Appellant's Ex. C.)

After the tape was played, Hall urged the trial court to play the recording for the jury in order for him to impeach A.D. on that fact that she *had*, contrary to her assertions, given him information to attack M.T.'s credibility. But reasoning that "whatever good comes out of that [recording] . . . is completely outweighed by 403[5] . . . and . . . because it goes tooth and nail against every aspect of the motion in limine," the trial court ruled inadmissible the portion of the recording in which Hall and A.D. discuss the Kentucky incident.[6] (Tr. at 218.)

---

[5] Indiana Evidence Rule 403 states that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."

[6] The trial court also cited Indiana Evidence Rules 412 and 404(b) as a basis for its ruling. Rule 404(b) provides in relevant part that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. .

As the jury returned to the courtroom, the trial court called counsel to the bench and warned the prosecutor to "keep in mind if you ask questions on redirect that expand on that, that does in a sense open the door to things that have not been opened at this point in time which would allow all that to be played." (Tr. at 221–22.) Accordingly, the prosecution did not inquire further about the phone call on re-direct. But on re-cross examination of Hall the following day, the prosecutor asked him about the phone call:

> Q: You placed and recorded a phone call with A.D., is that right?
>
> A: Yes, I did.
>
> . . .
>
> Q: [Y]ou told A.D. that you were attempting to get, quote, your little portfolio together, end quote, for your people, whoever they may be, I don't know, to get your things ready for this, is that right?
>
> A: Yes.
>
> . . .
>
> Q: And then immediately thereafter you—paraphrasing your view, correct me if I'm wrong, you asked A.D. to give you anything in which you could attack the twelve year old's credibility with, is that right?
>
> A: She had already told me—
>
> Q: Hold on, Mr. Hall. I asked you a specific question, yes or no.
>
> A: I asked her to give me what she gave me.
>
> Q: I—you asked her—

---

. . This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

8

A: Tell me what you told me, that's what I—

Q: You asked her to give you whatever you needed to attack the twelve year old's credibility, isn't that right, yes or no, Mr. Hall? Remember the court's order, yes or no.

A: Yes.

(Tr. at 592–93.)

On re-re-direct, Hall's counsel began to ask, "Mr. Hall, in reference to the question the State asked about that conversation with A.D., where you asked A.D. to give you back information . . . ." (Tr. at 594.) But the prosecutor interrupted and objected to the question, and the trial court sustained the objection, finding Hall's question to be outside the scope of the State's question.

Hall also testified to his version of the events of September 19th. According to Hall, he was asleep in bed when he awoke to M.T. touching his penis. He stated that he immediately admonished the girl and phoned A.D. The call went straight to voicemail, he said, but he did not leave a message because he was arguing with M.T., who was purportedly pleading with him to allow her to call her mother. Hall also testified that he observed M.T. use his phone to place a call to A.D. However, Hall neither subpoenaed A.D.'s phone records nor introduced his own into evidence, so there is no record of the supposed calls to A.D. from his phone.

During his testimony, Hall also admitted that he took a shower immediately after the alleged incident. Additionally, he admitted that M.T. was in bed with him and acknowledged that she was wearing the gym shorts upon which his DNA was found during the alleged incident. He also stated that he tried to act as a father figure to M.T. After Hall's testimony, the defense rested.

The jury found Hall guilty as charged. At a sentencing hearing, the trial court merged Hall's class C felony child molesting conviction with his class A felony child molesting conviction and sentenced him to an aggregate thirty-five-year sentence.

9

On appeal, Hall argued that the trial court abused its discretion in denying his motion to compel A.D. to answer the deposition question about the Kentucky incident and in excluding from evidence the substance of the phone conversation with A.D., in violation of his Sixth Amendment right to confront witnesses against him, as well as in excluding his proffered testimony of M.T.'s alleged reputation for untruthfulness in her community. By split decision, the Court of Appeals concluded that the trial court abused its discretion in excluding the phone call from evidence. Hall v. State, 15 N.E.3d 1107, 1121 (Ind. Ct. App. 2014) (Vaidik, C.J., dissenting in part). The State sought transfer, which we granted, thereby vacating the Court of Appeals opinion.[7] See Ind. Appellate Rule 58(A).

## Standard of Review

Generally, a trial court's ruling on the admission of evidence is accorded "a great deal of deference" on appeal. Tynes v. State, 650 N.E.2d 685, 687 (Ind. 1995). "Because the trial court is best able to weigh the evidence and assess witness credibility, we review its rulings on admissibility for abuse of discretion" and only reverse "if a ruling is 'clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights.'" Carpenter v. State, 18 N.E.3d 998, 1001 (Ind. 2014) (quoting Clark v. State, 994 N.E.2d 252, 260 (Ind. 2013)).

However, Hall goes beyond alleging evidentiary errors: he contends that the trial court's rulings deprived him of his ability to fully confront his accuser. Specifically, Hall asserts that the trial court violated his Sixth Amendment right to cross-examination when it forbade him from further inquiring into the Kentucky incident by denying his motion to compel discovery and by

---

[7] We do, however, summarily affirm the Court of Appeals' determination that the trial court properly excluded Hall's proffered evidence of M.T.'s alleged reputation for untruthfulness in her community. See Ind. Appellate Rule 58(A)(2).

excluding from evidence his phone conversation with A.D. "[W]here, as here, a constitutional violation is alleged, the proper standard of appellate review is de novo." Speers v. State, 999 N.E.2d 850, 852 (Ind. 2013).

## I.    Motion to Compel Discovery

First, Hall maintains that the trial court erred in denying his motion to compel A.D. to answer the certified deposition question regarding what happened between M.T. and another child when the family was living in Kentucky. According to Hall, the trial court's ruling prevented him from obtaining information about a "prior false accusation of sexual misconduct" by M.T. and thus deprived him of the ability to fully confront his accuser under the Confrontation Clause.[8] (Appellant's Br. at 28.)

As mentioned above, Indiana Evidence Rule 412 prohibits, subject to listed exceptions,[9] the admission into evidence in a civil or criminal proceeding involving alleged sexual misconduct evidence offered to prove a victim's prior sexual behavior or sexual predisposition. However, in State v. Walton we stated that "[t]o the extent a defendant offers evidence of prior false accusations

---

[8] A "bedrock procedural guarantee," the Confrontation Clause of the Sixth Amendment provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI; Speers, 999 N.E.2d at 852 (quoting Crawford v. Washington, 541 U.S. 36, 42 (2004)). "A 'primary interest' secured by the Confrontation Clause is the right of cross-examination." Koenig v. State, 933 N.E.2d 1271, 1273 (Ind. 2010) (quoting Davis v. Alaska, 415 U.S. 308, 315 (1974)).

[9] The exceptions set forth in Evidence Rule 412(b) include evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the defendant was the source of physical evidence; evidence of specific instances of a victim's sexual behavior with the accused, if offered to prove consent; and evidence "whose exclusion would violate the defendant's constitutional rights."

11

of rape[10] to impeach the credibility of the witness, we hold that its admission does not run afoul of the Rape Shield Rule." 715 N.E.2d 824, 827 (Ind. 1999). This is because Rule 412 is designed to preclude evidence of a victim's prior sexual conduct, not *verbal* conduct like a prior false allegation of rape. Id. at 826. Moreover, in presenting verbal conduct, the defendant seeks to prove for impeachment purposes that the complaining witness had previously made a false accusation of rape—not to impermissibly probe the victim's sexual history. Id.

A majority of the Court of Appeals agreed with Hall and determined that A.D.'s statements in the phone call with Hall "indicate[d] that M.T. had made a prior false allegation of sexual misconduct which may, depending on the evidence obtained through further discovery, be admissible under Walton." Hall, 15 N.E.3d at 1121. Thus, in the majority's view, by failing to require A.D. to answer the deposition question about "what had happened" between M.T. and the boy in Kentucky, the trial court prevented Hall from obtaining discovery on a relevant, non-privileged matter that bore directly on M.T.'s credibility under Indiana Trial Rule 26(B)(1). Chief Judge Vaidik agreed with her colleagues in the majority that the trial court should have granted Hall's motion to compel but found the error to be harmless.

Like all three judges on the Court of Appeals, we find that A.D.'s response to Hall's question about the Kentucky incident *could* have revealed potentially relevant information under Indiana Trial Rule 26(B)(1) that *could* have provided Hall with knowledge of what he classifies as M.T.'s alleged prior false accusation of sexual misconduct[11] in order to *potentially* establish its admissibility at trial. Accordingly, the trial court should have granted Hall's motion to compel

---

[10] Evidence of a prior false accusation of rape is admissible if either: (1) the victim admitted to making a prior false allegation of sexual misconduct; or (2) the victim's prior accusation was "demonstrably false." Walton, 715 N.E.2d at 826.

[11] It is not necessary for this Court to determine whether M.T.'s statement about the Kentucky incident constituted a prior false allegation of sexual misconduct under Walton.

discovery in order to fully secure his Sixth Amendment right to confront witnesses against him. But this does not end our inquiry, as "certain constitutional errors, no less than other errors, may have been 'harmless' in terms of their effect on the fact-finding process at trial." Koenig v. State, 933 N.E.2d 1271, 1273 (Ind. 2010). "[B]efore a federal constitutional error may be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24 (1967).[12] In other words, "[v]iolations of the right of cross-examination do not require reversal if the State can show beyond a reasonable doubt that the error did not contribute to the verdict." Koenig, 933 N.E.2d at 1273.

Similar to a harmless error analysis, a court determining whether an error is harmless beyond a reasonable doubt must do so on review of the whole record. Id.

> Whether such an error is harmless [beyond a reasonable doubt] in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).[13] See also Koenig, 933 N.E.2d at 1273. Importantly, when weighing these factors to determine whether a confrontation error was harmless

---

[12] "The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986) (citations omitted).

[13] In Van Arsdall, the United States Supreme Court determined that the trial court erred in failing to allow the defendant to cross-examine a witness for the State about his agreement to speak with the prosecution about the murder at hand in exchange for the dismissal of an unrelated pending criminal charge. Id. at 676, 679. Outisde the jury's presence, the witness testified that he had not been offered any promises or inducements in exchange for his testimony. Id. at 676–77. After laying out the five-factor test, the Court

13

beyond a reasonable doubt, a reviewing court must "assum[e] that the damaging potential of the cross-examination were fully realized." Van Arsdall, 475 U.S. at 684.

Applying these factors to the circumstances at hand, it is apparent that the trial court's denial of Hall's motion to compel discovery, even if in violation of the Sixth Amendment, was harmless beyond a reasonable doubt. First, A.D.'s likely response to Hall's discovery inquiry was not highly important to the State's case against Hall, which was built around her daughter M.T.'s unwavering account that Hall molested and then raped her while A.D. was at work, as well as the physical evidence—most notably the semen on the crotch area of the shorts M.T. was wearing at the time of the incident and M.T.'s fresh genital lacerations—and evidence of Hall's behavior that corroborated her accusations. Rather, the purpose of A.D.'s testimony was to provide a timeline for her daughter's rape and to convey to the jury M.T.'s hysterical and distressed demeanor after the fact. Had the trial court required A.D. to answer Hall's question and speak about the Kentucky incident, all the jury would have learned was that approximately three years earlier M.T. had engaged in mutual touching with a boy her age and had been truthful about it. Thus, while her testimony about the events of September 19th and her daughter's demeanor was largely important for the State, A.D.'s likely testimony about the Kentucky incident was not at all significant to the State's strong case against Hall. This factor weighs heavily in the State's favor.

Second, assuming that the motion in limine would not have prevented it, A.D.'s likely testimony about the Kentucky incident would not have been cumulative to other evidence about the mutual encounter three years prior. However, this can partially be attributed to Hall, who apparently did not seek to discover or introduce other evidence of the Kentucky incident obtained from a source other than A.D. Third, even assuming that the Kentucky incident was material, there was similarly no evidence introduced by Hall to contradict A.D.'s likely testimony (again

---

remanded the case to the Delaware Supreme Court to determine whether the confrontation error was harmless beyond a reasonable doubt. Id. at 684.

14

assuming the encounter's admissibility), nor was there corroborating evidence of her potential testimony. Consequently, these two factors do not favor either the State or Hall.

Fourth, Hall was able to extensively cross-examine A.D., although not to the extent he wished regarding the Kentucky incident. Hall was able to fully question A.D. about her account of the day in question and her impression of M.T. after the fact. And importantly, Hall was able to extensively cross-examine his accuser M.T., except about the Kentucky incident, an encounter we consider very factually distinct from the circumstances of this case. It is uncontroverted that approximately three years earlier in a different state M.T. disclosed, when asked by her mother's friend if she had ever been touched, that a boy her age had touched her. An investigation by the Kentucky equivalent of DCS determined that M.T. had been telling the truth, and that the touching was mutual and experimentative between the nine year olds. Given the stark factual dissimilarities between this encounter and the present circumstances, and the extent of the cross-examination of A.D. and M.T. otherwise permitted, this factor largely favors the State.

Fifth is the overall strength of the prosecution's case against Hall. We turn now to the uncontroverted facts at hand:

- Hall and A.D. (M.T.'s mother) decided, just days before the incident, to end their relationship;
- Hall continued to reside at A.D.'s apartment despite their break up;
- Hall was home alone with M.T. on the afternoon of the incident;
- M.T. testified that Hall molested and raped her;
- M.T. has not wavered in her account of her molestation and rape;
- Hall admitted to immediately taking a shower after the alleged incident;
- Both Hall and M.T. recalled M.T. putting on the same gym shorts after the alleged incident that she was wearing before;
- Hall's semen was present on the crotch area of the gym shorts M.T. was wearing at the time of the incident;

15

- M.T. fled the apartment after the molestation and rape;
- M.T. arrived at the apartment complex's leasing office in search of a phone;
- Leasing office employee Sonja Cumberlander observed that M.T. appeared "very excited" and nervous when she asked to use the phone in the leasing office (Tr. at 119);
- M.T. immediately reported the molestation and rape to a trusted adult;
- After M.T. reported the molestation and rape and A.D. had been contacted, A.D. phoned Hall. Not knowing the purpose of her call, Hall gave an unprompted statement to A.D., when she asked Hall what had happened to M.T., that he awoke in bed to find M.T. touching his penis;
- By his own admission, Hall stated that M.T. was in his bed;
- Hall drove right past A.D. without stopping when A.D. returned home to find out what had happened between Hall and M.T.;
- M.T. cried out "Oh my God, oh my God, there he is" when Hall drove by the building (Tr. at 120);
- A.D. found her daughter "hysterical," crying, and unable to speak when she met her at the apartment complex's office (Tr. at 158);
- A.D. testified that she had never seen her daughter as upset as she was in the office after the incident;
- M.T. told her mother that Hall had just raped her;
- Nurse Fisher testified that M.T.'s same-day vaginal examination revealed three fresh lacerations consistent with her description of the rape;
- There is no record of the phone calls that Hall claims M.T. and he made after he supposedly awoke in bed to find her touching his penis;
- Hall attempted to learn information from A.D. to smear M.T.'s credibility; and
- Hall spent three months hiding from authorities after charges were filed.

Taken together, and viewed in a light most favorable to the verdict, the evidence against Hall is remarkably strong, would almost certainly survive a sufficiency challenge, and demonstrates that,

16

even though the trial court erred in failing to compel A.D. to answer Hall's deposition question about the Kentucky incident, the jury had before it substantial evidence upon which it could reasonably infer Hall's guilt.

In fairness to Hall, we acknowledge that the jury did not have the opportunity to assess for themselves whether they believed, as we do, that the Kentucky incident was quite factually distinct from the present circumstances, and that M.T. did not make a false allegation of sexual misconduct when she disclosed that she had been touched. Assuming the incident's admissibility under Indiana Evidence Rule 412, and for the sake of our review that M.T.'s statement was ambiguous as to her consent to the touching, *at most* all Hall would have received was impeachment evidence that the jury would have considered alongside the nearly overwhelming evidence of his guilt listed above—including the significant physical, temporal, and behavioral evidence that corroborates M.T.'s unwavering account of her molestation and rape.

But once more, we reiterate that it is uncontroverted that three years prior to the rape, A.D.'s friend asked M.T. if she had ever been touched, M.T. responded truthfully that she had at an earlier time, and an investigation revealed that the touching had been mutual with another nine year old. Though the trial court should have granted Hall's motion to compel in order for A.D. to provide Hall with this potentially admissible information, we can confidently say that on review of all the evidence, the State's case against Hall is overall very strong, and would not have been weakened had the Kentucky incident been admitted into evidence. Accordingly, this final factor greatly favors the State.

Considering that three out of the five Van Arsdall factors substantially favor the State, and none favor Hall, and considering that A.D.'s potential response to his question would have neither helped nor hurt Hall, we find the trial court's failure to compel her response harmless beyond a reasonable doubt. In other words, because the State met its burden of showing beyond a reasonable doubt that A.D.'s potential response did not contribute to the verdict, this violation of Hall's right of cross-examination does not require reversal. See Koenig, 933 N.E.2d at 1274 (holding trial court's admission of laboratory report without opportunity to confront its creator was harmless

17

beyond a reasonable doubt given defendant's self-implicating statements to police); McCorker v. State, 797 N.E.2d 257, 267 (Ind. 2003) (holding any error resulting from defendant not being allowed to cross-examine State's witness for bias harmless beyond a reasonable doubt in light of cross-examination defendant conducted and substantial cumulative evidence); and Standifer v. State, 718 N.E.2d 1107, 1111 (Ind. 1999) (holding defendant's denial of opportunity to fully cross-examine State's witnesses for bias harmless beyond a reasonable doubt given "ample evidence" introduced to support convictions).

## II.     Phone Call

Similarly, Hall contends that the trial court violated his Sixth Amendment right to confrontation by excluding his phone call with A.D. from evidence. Though the motion in limine precluded him from questioning A.D. about M.T.'s prior sexual conduct or her specific acts of dishonesty,[14] Hall argues that the State "opened the door" to the admission of such evidence during its direct examination of A.D. and its cross examination of Hall when the prosecutor asked questions about the phone call and inquired into the information Hall wanted from A.D.

As Hall points out, Indiana courts have long recognized that otherwise inadmissible evidence may become admissible if a party "opens the door" to questioning on that evidence in order to correct a "deceptively incomplete disclosure." Gilliam v. State, 270 Ind. 71, 76–77, 383 N.E.2d 297, 301 (1978). In these instances, the evidence relied upon to "open the door" "must leave the trier of fact with a false or misleading impression of the facts related." Id.

Like Hall and a majority of the Court of Appeals, we find that the State's questioning of A.D. on direct examination and Hall on cross examination about the contents of their phone

---

[14]    Specifically, the motion in limine forbade "[a]ny questions, testimony, evidence, or comments concerning any specific acts of dishonesty by any State's witness." (App. at 149.)

conversation opened the door to the admission into evidence of that conversation, despite the motion in limine and Rule 412, in order to demonstrate the basis for Hall's inquiry and to correct A.D.'s false assertions that she did not provide Hall with any information to attack her daughter's credibility. To begin, the State questioned A.D. about a phone conversation that it knew contained information about M.T.'s prior sexual conduct and a potential act of dishonesty. Knowing that the motion in limine barred A.D. from discussing the Kentucky incident, the State asked her the reason for Hall's phone call. When A.D. responded truthfully that "[h]e wanted to know information about M.T. that could clear his name," (Tr. at 164), it appeared to the jury that Hall, *with no basis*, had attempted to gather information to smear his alleged victim's credibility.

Hall's question was reasonable, however, as he wanted to know more about "this stuff that happened in Kentucky." (Appellant's Ex. C.) To Hall, the Kentucky incident *could* have been a prior accusation of sexual misconduct by M.T., and thus a valuable piece of information as he prepared his defense. But as the jury heard it, Hall, having just been accused of child molestation, was baselessly fishing for ways to destroy his twelve-year-old alleged victim's credibility.

Moreover, the jury's false impression of the conversation was compounded when A.D. repeatedly lied during cross examination and stated "I didn't give him any information." (Tr. at 199.) At this point, Hall urged the trial court to play the recording of the phone conversation for the jury. And though the trial court excluded the phone call from evidence, it did warn the State that asking further questions about the phone call would open the door to the conversation's admissibility.

But the State failed to heed the trial court's warning. The following day, the prosecutor asked Hall about the phone call; he phrased his question as "you asked A.D. to give you anything in which you could attack the twelve year old's credibility with, is that right?" (Tr. at 593.) Hall attempted to explain that "[s]he had already told me," (Tr. at 593), but the prosecutor interrupted, repeated the question, and succeeded in getting a reluctant "[y]es" from Hall. (Tr. at 593.) Once more, this created a misleading impression of the facts that under Gilliam opened the door to the phone conversation's admissibility. 270 Ind. at 76–77, 383 N.E.2d at 301. Hall's counsel then

tried to ask his client about the phone call, but to no avail: the trial court sustained the prosecutor's immediate objection.

By excluding the contents of the phone call after the State opened the door to its admissibility, the trial court denied Hall the opportunity to demonstrate to the jury that A.D. *had* given him relevant information about M.T.'s credibility during their conversation—and before it. Designed to elicit testimony from A.D. that Hall had baselessly inquired about M.T.'s credibility, the State's line of questioning succeeded in doing just that but also served to mislead the jury, who had no way of knowing that Hall was in fact seeking *more* information about a potential prior false accusation of sexual misconduct.[15]

Thus, the trial court erred in excluding the phone conversation, which would have corrected A.D.'s "deceptively incomplete disclosure." Id. As the Court of Appeals stated, "the State used the phone call as a sword to attack Hall's credibility, while it simultaneously used the motion in limine as a shield to immunize A.D. from cross-examination, to bolster A.D.'s false testimony . . . and to keep Hall from answering questions to rebut the State's attack." Hall, 15 N.E.3d at 1114.

Nonetheless, we review this error for harmlessness beyond a reasonable doubt. Applying the first of the Van Arsdall factors to the trial court's exclusion of the phone conversation between Hall and A.D., we find that the phone call was not highly important to the State's case. Contrary to Hall's assertion that he had a right under the Sixth Amendment to challenge M.T.'s credibility by presenting evidence that she had made a prior false accusation of sexual abuse in Kentucky, at most the phone call would have informed the jury that M.T. was mutually "experimentin'" with a boy her age. (Appellant's Ex. C.) Setting aside the next logical question of whether this information was even admissible under Indiana Evidence Rule 412, consensual touching between

---

[15]  To make matters worse, Hall was prohibited from asking A.D. about this information during discovery as a result of the trial court's denial of his motion to compel discovery.

two nine-year-old children, disclosed truthfully some time after the fact, is far different from a false allegation of molestation and rape made immediately after the alleged incident, though Hall would have us believe differently. And as set forth above, the State's case centered upon M.T.'s unwavering testimony that Hall molested and raped her and the physical, temporal, and behavioral evidence that corroborated her accusations. Therefore, it cannot be said that the contents of the phone call were highly important in order for the State to establish beyond a reasonable doubt that Hall raped twelve-year-old M.T. Consequently, this factor considerably favors the State.

Next, we look to whether the phone call would have been cumulative evidence. Although it would not have been, this factor only marginally favors Hall, as the reference to the Kentucky incident was simply not relevant to the ultimate factual question before the jury. Similarly, the third Van Arsdall factor favors neither Hall nor the State, for although no other evidence was introduced that would have placed the contents of the phone call before the jury, the phone call did not go to a "material" point at issue—only whether M.T. had engaged in consensual touching with a boy her own age three years ago in another state.

However, the fourth factor clearly favors the State, as Hall was otherwise permitted to extensively cross-examine both A.D. and M.T. about what happened before, during, and after the rape. He may not have gotten his wish to have the phone conversation admitted into evidence, and may have been denied the opportunity to fully cross-examine A.D. about the contents of their conversation, but Hall was otherwise decidedly allowed and able to question A.D., M.T., and other relevant parties about the accuracy and truthfulness of their accounts.

Fifth and finally, we look to the overall strength of the State's case against Hall. As set forth above, there is substantial independent evidence of probative value upon which the jury could have based its decision that collectively establishes Hall's guilt beyond a reasonable doubt. Chief among these pieces of evidence is M.T.'s unwavering testimony that Hall molested and then raped her while her mother was at work. And contrary to Hall's assertion that "everything comes down to credibility," (Oral Argument at 15:25), a scenario where the errors made here may have been significantly more problematic, the presence of Hall's semen on the crotch area of the shorts M.T.

21

was wearing during the incident and fresh lacerations on M.T.'s genitals substantiate M.T.'s testimony, as does the other extensive evidence discussed above. Additionally, Hall admitted that M.T. was in his bed, and that he showered after his encounter with M.T. He also offered an unprompted statement to A.D., before she knew what had happened between Hall and her daughter, that he awoke in bed to find M.T. touching his penis. Another significant fact is that Hall hid from authorites for three months after the State filed charges against him. And all when M.T. had no motive to fabricate a story: Hall and her mother had already broken up, so Hall was imminently going to be out of her life, just as soon as he moved out of her apartment. Hall calls our attention to what he describes as conflicting evidence, but this is merely an invitation for us to reweigh the evidence in his favor, which we will not do.

Taking all of the evidence together, and viewing that evidence in a light most favorable to the verdict, it is clear that the State had a strong and convincing case against Hall. Thus, the fifth factor significantly favors the State.

Once more, three out of the five <u>Van Arsdall</u> factors handily favor the State, and once more, the information Hall sought to place before the jury would not have helped his defense.[16] As such, the trial court's exclusion of the phone call from evidence, even if considered to violate Hall's Sixth Amendment right to cross-examination, was nevertheless harmless beyond a reasonable doubt. Put differently, although Hall was not able to play the phone conversation for the jury or question A.D. about the call, the State presented ample evidence of Hall's guilt and demonstrated

---

[16] In reality, playing the phone conversation was arguably more likely to harm than help Hall's case. Though, as discussed above, the jury would have understood that Hall had a reason for inquiring into M.T.'s past, the jury would have also learned that "this stuff that happened in Kentucky" was simply not relevant to the ultimate factual question before them and would have heard Hall ask his twelve-year-old victim's mother for information with which he could destroy her daughter's credibility. (Appellant's Ex. C.)

beyond a reasonable doubt that the confrontation error did not contribute to the verdict against him.  See Koenig, 933 N.E.2d at 1273–74.

In summary, given the extensive evidence of Hall's guilt presented by the State, the likely minimal impact of the information he wanted before the jury, and the cross-examination of witnesses Hall was otherwise able to conduct, the jury's verdict would not have been any different had the jury heard and considered Hall and A.D.'s conversation and the Kentucky incident. Consequently, we can confidently say that, on the whole record, the trial court's twin errors were harmless beyond a reasonable doubt, and Hall's otherwise valid conviction should not be set aside.

## Conclusion

Because the trial court's alleged errors in denying Hall's motion to compel discovery and in excluding from evidence the phone conversation between Hall and A.D., even if considered violations of Hall's Sixth Amendment right to confrontation, were harmless beyond a reasonable doubt, we affirm Hall's conviction for class A felony child molesting.

Dickson and Massa, J.J., concur.
Rucker, J., dissents with separate opinion in which Rush, C.J., joins.

23

**Rucker, J., dissenting.**

No matter how finely the evidence is parsed in this case, the inescapable fact is that Hall was denied his Sixth Amendment right of cross-examination. At stake here is whether that denial—a clear constitutional error—was harmless. In Chapman v. California the Supreme Court declared "before a federal constitutional error can be held harmless, the [reviewing] court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. 18, 24 (1967). Because I can make no such declaration, I respectfully dissent.

The majority is quite correct that "the trial court should have granted Hall's motion to compel discovery[,]" slip op. at 13; and that "the trial court erred in excluding the phone conversation, which would have corrected A.D.'s deceptively incomplete disclosure." Id. at 21 (quotation omitted). But I disagree with my colleagues' apparent view that in conducting a Chapman harmless-error analysis our focus is whether "an error is harmless beyond a reasonable doubt . . . on review of the whole record." Id. at 13. Instead the question is whether "the State can show beyond a reasonable doubt that the error *did not contribute to the verdict.*" Koenig v. State, 933 N.E.2d 1271, 1273 (Ind. 2010) (emphasis added). More simply put, on review of the record this Court must "decide whether the not-fully-impeached evidence might have affected the reliability of the factfinding process at trial." Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986). "The opportunity for cross-examination, protected by the Confrontation Clause, is critical for ensuring the integrity of the factfinding process." Kentucky v. Stincer, 482 U.S. 730, 736 (1987).

"While some constitutional claims by their nature require a showing of prejudice with respect to the trial as a whole, the focus of the Confrontation Clause is on individual witnesses. Accordingly, the focus of the prejudice inquiry in determining whether the confrontation right has been violated must be on the particular witness, not on the outcome of the entire trial." Van Arsdall, 475 U.S. at 680 (internal citation omitted). A Chapman harmless-error analysis applies once the reviewing court has found an infringement upon the defendant's constitutional rights. Id. at 684 ("hold[ing] that the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to Chapman harmless-error

analysis"). And in the case before us the infringement is that "the defendant was denied the right 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" Pennsylvania v. Ritchie, 480 U.S. 39, 54 (1987) (quoting Davis v. Alaska, 415 U.S. 308, 318 (1974)).

The Supreme Court has explained that a Chapman harmless-error analysis turns on a number of non-exclusive factors including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Van Arsdall, 475 U.S. at 684 (citations omitted). Applying those factors here reveals the following. First, the testimony the State elicited from A.D. was only minimally important to the prosecution's case-in-chief; but the excluded testimony that Hall sought was highly probative of the witness' credibility and was far from cumulative of other testimony in the record. Next, the trial court's motion *in limine* prevented Hall from demonstrating "the presence . . . of evidence . . . contradicting the testimony of the witness on material points[.]" Id. Namely, whether M.T. had made a prior false allegation of sexual abuse.[1] Hall's defense was premised upon a complete denial of M.T.'s allegations, making quite relevant any inquiry concerning a prior false allegation of sexual assault. And although defense counsel was permitted to cross-examine the witness on other matters, this limitation prevented Hall from presenting evidence relevant to his defense that the allegations were untrue. See Ritchie, 480 U.S. at 63 (Blackmun, J., concurring in part and concurring in the judgment) (citing Davis as an example and explaining that in certain cases "simple questioning will not be able to undermine a witness' credibility and in fact may do actual injury to a defendant's position"). This is particularly

---

[1] The majority makes a point of highlighting the factual differences between the case at hand and those of the Kentucky incident and thus downplays the import of the testimony that Hall sought to introduce. According to the majority, the testimony in question is that "an investigation revealed that the touching had been mutual with another nine year old." See slip op. at 17; accord Id. at 15. To be sure, in order to have made a prior *false* claim of sexual abuse, the allegation must have been proven to be a falsity. The fact that the investigation from a state agency revealed a consensual touching between two children rather than an assault committed against M.T. does not make her prior claim of sexual assault any less significant to the jury's determination of her credibility.

important here in light of the fact that the corroborating evidence in favor of the State was circumstantial and open to interpretation. See, e.g., Tr. at 328-30 (State witness explaining that the only seminal fluid recovered was found on M.T.'s shorts and contained only trace amounts of sperm, which could have been deposited by coming into contact with another surface on which the seminal fluid was present); Tr. at 375 (State witness testifying that there was "[no] way to tell whether DNA that was found was deposited there through direct or indirect transfer"); Tr. at 288-90, 297-98 (sexual assault nurse examiner testifying that she identified three lacerations in M.T.'s vagina but could neither conclusively determine at what point in time nor the manner in which the injuries were inflicted).

Further, contrary to the majority's view it appears to me that the State's case was not at all very strong. As Judge Najam pointed out writing for the Court of Appeals' majority, "Hall's defense depended entirely on the jury crediting his version of events over M.T.'s[.]" Hall v. State, 15 N.E.3d 1107, 1115 (Ind. Ct. App. 2014), vacated. And as the trial court expressed when considering the parties' pre-trial motions, "[t]he credibility of [sic] complaining witness is paramount." Tr. at 14; accord McCarthy v. State, 749 N.E.2d 528, 535 (Ind. 2001) ("As with most cases involving claims of child molestation, here the credibility of witnesses was a key issue at trial."). As the majority correctly observes, the State's line of questioning "served to mislead the jury, who had no way of knowing that Hall was in fact seeking *more* information about a potential prior false accusation of sexual misconduct." Slip op. at 20-21 (footnote omitted). As the Supreme Court has noted, "the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the] testimony . . . ." Davis, 415 U.S. at 317 (finding reversible error of trial court's ruling to deny defendant the right to cross-examine witness regarding his prior juvenile conviction in an effort to show bias).

Cross-examination as protected by the Sixth Amendment includes the right to cast doubt on the witness' testimony through impeachment with such statements. Olden v. Kentucky, 488 U.S. 227, 231 (1988) (per curiam). By denying Hall the right to impeach A.D.'s testimony with her prior inconsistent statements, the trial court allowed the jury to be left with an incomplete picture from which it was asked to assess the credibility of the witnesses. This denial certainly deprived Hall of

3

impeachment evidence regarding the complaining witness. But an even greater harm is that the violation also prevented Hall from impeaching A.D.—the testifying witness. As the majority correctly observes, A.D.'s testimony about M.T.'s demeanor and the timeline of events was introduced at trial to corroborate M.T.'s version of events that afternoon and substantiate the allegations of molestation. See slip op. at 16-17. By allowing A.D.'s testimony that she "didn't give him any information" to go unchallenged, Tr. at 199, "[t]he witness was in effect asserting, under protection of the trial court's ruling, a right to give a questionably truthful answer to a cross-examiner pursuing a relevant line of inquiry[.]" Davis, 415 U.S. at 314. Had Hall been permitted to impeach A.D. with her prior inconsistent statements, as he should have been, he would have revealed to the jury A.D.'s "deceptively incomplete disclosure." Slip op. at 19 (quoting Gilliam v. State, 383 N.E.2d 297, 301 (Ind. 1978)). Not only would this have enabled Hall to defuse the harm of that evidence, but this line of questioning also would undermine A.D.'s credibility and call her entire testimony into doubt. In sum the exclusion of further inquiry into the phone call denied Hall his constitutional right to cross-examine A.D., thus preventing him from introducing relevant testimony while simultaneously permitting the State to present a distorted presentation of that same evidence to the jury.

In order to declare the error committed in Hall's case harmless beyond a reasonable doubt, the Court must be unequivocally convinced this error did not contribute to a guilty verdict. It seems to me incongruous for the majority to say on the one hand "the State's line of questioning succeeded in" "elicit[ing] testimony from A.D. that Hall had baselessly inquired about M.T.'s credibility," and "also served to mislead the jury, who had no way of knowing that Hall was in fact seeking *more* information about a potential prior false accusation of sexual misconduct." Slip op. at 20-21 (footnote omitted). But then declare on the other hand "it is apparent that the trial court's denial of Hall's motion to compel discovery [and exclusion of the phone conversation], even if in violation of the Sixth Amendment, was harmless beyond a reasonable doubt." Id. at 14. To the contrary, the record makes clear Hall was erroneously denied his constitutional right to cross-examination. And the State has failed in its burden to demonstrate the "error did not contribute to the verdict." Koenig, 933 N.E.2d at 1273. Accordingly I cannot conclude the error was harmless beyond a reasonable doubt. See Reed v. State, 748 N.E.2d 381 389-90 (Ind. 2001) (concluding that violation of

4

defendant's Sixth Amendment right constituted reversible error where trial court denied defendant's motion to compel deposition testimony and refused to admit videotape of the same subject matter to impeach witness during trial). I would therefore reverse Hall's conviction and remand this cause for a new trial.

Rush, C.J., concurs.