## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 27 2017, 10:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Frederick Vaiana
Voyles Vaiana Lukemeyer Baldwin & Webb
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Julius Gordon, <br> *Appellant-Defendant*, <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff*. | September 27, 2017 <br><br> Court of Appeals Case No. 49A02-1704-CR-674 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Kurt Eisgruber, Judge <br><br> Trial Court Cause No. 49G01-1503-MR-9294 |

**Brown, Judge.**

[1]     Julius Gordon appeals his convictions for murder and carrying a handgun without a license and raises two issues which we revise and restate as:

> I.      Whether the trial court erred in not admitting a recording of a phone call into evidence; and
>
> II.     Whether the court erred in entering his conviction for carrying a handgun without a license as a level 5 felony.

We affirm and remand.

## Facts and Procedural History

[2]     Between 4:00 and 5:00 a.m. on March 14, 2015, Gordon exchanged text messages with Hailey McKibben. At some point, McKibben was with J.R. Kinsey and sent Gordon a text message stating she "had a lick," by which she meant she had someone to rob. Transcript Volume II at 204. McKibben sent Gordon a message stating where she and Kinsey were located. McKibben later sent messages to Gordon stating that Kinsey had a gun and telling Gordon not to come, but Gordon replied stating not to worry about it. A short time later, while Kinsley was seated in the driver's seat and McKibben was seated in the front passenger seat of a vehicle, McKibben saw a "darker car, smaller" drive by and recognized that the car was the vehicle of Gordon's sister.[1] *Id.* at 189. The vehicle in which Kinsey and McKibben were seated was parked in a

---

[1] McKibben testified she had been in the vehicle of Gordon's sister five to seven times previously.

parking space with the rear of the vehicle facing the sidewalk and an apartment building and the front of the vehicle facing the parking lot.

[3] McKibben observed Gordon approach the back of the vehicle in which she and Kinsey were seated and saw that Gordon was holding his gun in his hand and had a black bandanna which covered part of his face.[2] Gordon tapped on the driver's side window with his gun, Kinsey "brought up his gun," and McKibben turned away once she heard gunshots. *Id.* at 192. McKibben then looked past Kinsey and saw Gordon running away. She then observed the vehicle of Gordon's sister drive by again. McKibben saw blood coming out of Kinsey's mouth and tried to lift his head. Kinsey died as a result of a gunshot wound to his chest. Gordon obtained treatment for a gunshot wound to his arm at Eskenazi Hospital. At the hospital, Gordon reported to law enforcement that he had been walking down the street when he heard gunshots and realized he had been shot and that he walked or ran to the hospital.

[4] On March 18, 2015, the State charged Gordon with Count I, murder; Count II, felony murder; Count III, attempted robbery resulting in serious bodily injury as a level 2 felony; Count IV, conspiracy to commit robbery resulting in serious bodily injury as a level 2 felony; and Count V, carrying a handgun without a

---

[2] When asked what Gordon was wearing, McKibben testified: "A black coat, black hat. I did not see his pants. I do believe the coat was zipped up. He was just wearing all black." Transcript Volume II at 191. She also indicated she could not see all of Gordon's face, that he had a black bandanna, and that it covered "the tip of his nose down." *Id.* at 192.

license as a level 5 felony.[3]  At his jury trial, Gordon's defense counsel sought admission, outside the presence of the jury, of a recording of a 911 call and played the recording for the trial court.  The State objected and argued that Gordon had not laid a foundation, that the recording contained hearsay, and that the State would not have the opportunity to cross-examine the caller.[4]  The court did not admit the recording into evidence.

[5]  Gordon testified that he decided to send a text message to McKibben on the morning of the shooting because he wanted to hang out with her.  He testified that, after McKibben sent a message to him stating she was going to sleep, he received another message from her asking if he had a gun and stating she "had a lick" and that he replied and asked "when?"  Transcript Volume III at 98. When asked, "[a]t that point were you thinkin maybe I still had a chance to . . . get with her tonight," Gordon replied affirmatively.  *Id.* at 99.  He testified that he left with condoms, his money, and his gun and that, after stopping at a friend's home to borrow the friend's phone, he drove in his sister's vehicle to meet McKibben.[5]  Gordon testified he drove around and "circled a parking lot," saw two people in a vehicle, and "assumed that was them."  *Id.* at 104.

---

[3] The State filed a separate information for Part II of Count V alleging that Gordon had previously been convicted of a felony.

[4] In arguing the recording was not admissible, the prosecutor stated in part "if I wanted to admit a call and the Defense did not want me to admit it I would . . . have to have my witness listen to it to authenticate it as their call . . . ."  Transcript Volume III at 66.

[5] Gordon indicated that his sister's vehicle was a small, two-door car and "[d]ark blueish."  Transcript III at 117.

When asked why he was going there, Gordon answered "[t]o try and hook up with [McKibben] still." *Id.* When asked if he knew "that she was with another dude at that point," he responded affirmatively. *Id.* When asked "do you remember receiving three messages from [McKibben] where . . . she was kind of sayin don't come, he – he knows somethin's up, he's grabbin my phone – did you see those messages," Gordon replied "[y]es, ma'am" but indicated he did not respond to the messages. *Id.* When asked why he did not respond, Gordon answered "Cause I wasn't . . . goin up there for the reasons that she thought I was goin there for so I didn't really quite know how to respond to those messages." *Id.* at 105.

[6]     Gordon testified he parked his sister's vehicle and approached the vehicle in which McKibben and Kinsey were seated. When asked "when you walked up to the car did you come from the back of the car from the sidewalk area," Gordon replied affirmatively. *Id.* at 106. He testified he walked up to the driver's side window of the vehicle in which McKibben and Kinsey were seated and knocked on the driver's window with his knuckle. He testified his gun was on his hip. Gordon testified that, at that point, he saw Kinsey grab his gun and start to lift it, that in response he pulled out his own gun, and that shots were fired. He testified that Kinsey shot first, that he knew that because the first bullet struck him in the arm, and that he then returned fire and ran. He testified that he ran towards the front of Kinsey's vehicle and down the parking lot towards his vehicle, that he entered his vehicle and drove to a friend's house, and that his friend's mother drove him to the hospital.

The jury found Gordon guilty as charged on Counts I through IV and guilty on Count V of carrying a handgun without a license as a class A misdemeanor. The court entered judgment of conviction on Counts I and V and sentenced Gordon to fifty-five years for murder on Count I, with fifty years in the Department of Correction and five years in community corrections, and one year for carrying a handgun without a license as a level 5 felony on Count V to be served concurrently.

## Discussion

## I.

The first issue is whether the trial court abused its discretion or erred in not admitting a recording of the 911 phone call into evidence. The trial court has broad discretion to rule on the admissibility of evidence. *Bradley v. State*, 54 N.E.3d 996, 999 (Ind. 2016). We review its rulings for abuse of that discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. *Id.* We will not reverse an error in the admission of evidence if the error was harmless. *Turner v. State*, 953 N.E.2d 1039, 1058 (Ind. 2011). Generally, errors in the admission of evidence are to be disregarded unless they affect the defendant's substantial rights. *Id.* at 1059. In viewing the effect of the evidentiary ruling on a defendant's substantial rights, we look to the probable effect on the fact finder. *Id.* The improper admission is harmless error if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court that

there is no substantial likelihood the challenged evidence contributed to the conviction. *Id.* Before a constitutional error may be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. *Hall v. State*, 36 N.E.3d 459, 467 (Ind. 2015), *reh'g denied*.

[9] Gordon argues that the court violated his right to present a defense when it did not permit him to present the recording of the 911 phone call. He argues that the State "claimed it did not have a 911 operator to certify it" and "next claimed it would have to have its witness listen to it to authenticate it, but never explained why it couldn't." Appellant's Brief at 14. Gordon argues he was denied his right to present a defense because the recording directly contradicted McKibben's testimony. The State responds that Gordon did not argue below that his right to present a defense would be violated if the recording was not admitted and thus that his claim is waived on appeal. It further argues that, waiver notwithstanding, the court did not deny Gordon's right to present a defense and that Gordon did not offer any testimony to provide a foundation for the admission of the recording into evidence. The State maintains that, while Gordon alleges the State could have had one of its witnesses listen to the recording and authenticate it, it was the burden of Gordon, as the proponent of the evidence, to lay a foundation for the recording's admission and that, "[t]o the extent Gordon believed that one of the State's witnesses could have provided the necessary foundation to admit the recording, he should have called that witness to testify in that regard." Appellee's Brief at 10. The State also argues that any error in the exclusion of the recording was harmless

because the caller's description was actually similar to McKibben's testimony and because it is undisputed that Gordon shot Kinsey and the recording would have had no bearing on Gordon's claim that he acted in self-defense.

[10] Gordon does not point to the record to show that he argued below that his right to present a defense would be denied if the 911 recording was not admitted into evidence. As he did not object on this basis at trial, the argument is waived on appeal. *See Cole v. State*, 28 N.E.3d 1126, 1135 (Ind. Ct. App. 2015) (holding the defendant's argument he was denied a right to present a defense was waived because he failed to make an objection on that basis at trial); *Saunders v. State*, 848 N.E.2d 1117, 1122 (Ind. Ct. App. 2006) (observing that a defendant may not object on one ground at trial and raise another on appeal and that any such claim is waived), *trans. denied*.

[11] Waiver notwithstanding, Gordon still cannot prevail. Ind. Evidence Rule 901(a) provides: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Authenticity may be established, among other methods, by "[t]estimony of a witness with knowledge that a matter is what it is claimed to be." Ind. Evidence Rule 901(b)(1). *See Davenport v. State*, 749 N.E.2d 1144, 1148 (Ind. 2001) (observing that the testimony of the Communications Center Director for 911 in South Bend concerning the master list of the daily 911 phone calls and description of the record keeping procedures for the 911 program was sufficient to establish the challenged 911 tape as an authentic recording of calls to the 911 number), *reh'g*

*denied*. The record reveals that Gordon offered the recording of the 911 call into evidence, and the State objected in part on the grounds that Gordon failed to provide a foundation for its admission. Gordon as the proponent did not produce any evidence supporting a finding that "the item is what [he] claims it is." *See* Ind. Evidence Rule 901(a). Accordingly, we cannot say the trial court abused its discretion in not admitting the recording.

[12] Further, even if the trial court erred in not admitting the 911 recording, we conclude any such error is harmless beyond a reasonable doubt. The recording reveals that the 911 caller reported "I heard four gunshots and saw a young black man run out of an apartment and get into a black car and take off." Defendant's Exhibit B at 0:12-0:23. The caller also reported the man "had on a like a navy blue or a black hoodie and jeans and he got into a small, black car." *Id.* at 0:54-1:06. The record further reveals that McKibben testified that Gordon was wearing a black coat and hat, that she did not see his pants, she believed his coat was zipped up, and that he was wearing all black. She also testified that she could see only part of Gordon's face and that a black bandanna covered the tip of his nose down. McKibben testified "I turned away once I heard them shooting," and when asked "[w]hat's the next thing that you saw," she testified "I pick up my head and I look past [Kinsey] and see [Gordon] running away." Transcript Volume II at 192. She testified that she then observed a car drive by which was "[t]he car that [she] recognized as his sister's." *Id.* at 193. McKibben testified that the vehicle of Gordon's sister was "a darker car, smaller and it was an older model." *Id.* at 189. Gordon testified that his sister's

vehicle was a small, two-door car and was "[d]ark blueish." Transcript Volume III at 117. Kinsey's vehicle was backed into a parking space with the rear of the vehicle facing the sidewalk and apartment building. Gordon testified that, after the shooting, he ran toward the front of Kinsey's vehicle and down the parking lot to his sister's vehicle, entered the vehicle, and drove away. Moreover, Gordon did not claim that he was not the person who shot Kinsey. He indicated that he approached the vehicle in which Kinsey and McKibben were seated "from the back of the car from the sidewalk area," that he walked up to the driver's side window and knocked on the window with his knuckle, that he saw Kinsey grab his gun and start to lift it, that in response he pulled out his own gun, that Kinsey shot first, and that he then returned fire. *Id.* at 106. To the extent the information provided by the 911 caller related to the description and identity of the person the caller observed, we conclude the admission of the recording would have had no or minimal effect on the fact finder. Based upon the record, we conclude that any error in not admitting the recording of the 911 call was harmless beyond a reasonable doubt.

## II.

[13] The next issue is whether the trial court erred in entering Gordon's conviction for carrying a handgun without a license as a level 5 felony. The State alleged in Count V that Gordon committed the offense of carrying a handgun without a license as a level 5 felony because he had a prior felony conviction. The jury found that Gordon was guilty of carrying a handgun without a license as a class A misdemeanor. Outside the presence of the jury, the trial court asked the State

about its intention regarding Part II or Count V, and the prosecutor replied: "Judge, it's the intention of the parties to not proceed on the part two of Count 5. We're gonna go ahead and just have the Court enter the conviction on the misdemeanor . . . carrying a handgun." Transcript Volume III at 177. The trial court later entered a sentencing order which indicated that Gordon was convicted of carrying a handgun without a license as a level 5 felony under Count V.

[14] Gordon argues that the trial court's sentencing order reflects a level 5 felony conviction for Count V and requests remand with directions to correct the order on Count V to reflect a conviction for a class A misdemeanor. The State agrees that the jury found Gordon guilty of carrying a handgun without a license as a class A misdemeanor, that it declined to proceed with the enhancement portion of the charge which would have elevated the offense to a level 5 felony, and that, however, in the abstract of judgment, Count V is labeled as a level 5 felony. The State indicates that it does not oppose correction of this clerical error.

[15] Based upon the record and the parties' agreement, we remand to the trial court with instructions to enter an amended sentencing order or abstract of judgment reflecting that Gordon's conviction under Count V for carrying a handgun without a license is a class A misdemeanor.

## *Conclusion*

[16] For the foregoing reasons, we remand for an amended sentencing order or abstract of judgment reflecting that Gordon's conviction under Count V is a class A misdemeanor. We otherwise affirm Gordon's convictions.

[17] Affirmed and remanded.

Vaidik, C.J., and Kirsch, J., concur.