## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 09 2015, 5:42 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Ruth Johnson
Deborah Markisohn
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Michael Gene Worden
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| T.J.,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | November 9, 2015<br><br>Court of Appeals Case No.<br>49A05-1501-JV-21<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Marilyn A. Moores, Judge<br><br>Trial Court Cause No.<br>49D09-1402-JD-286 |

**Kirsch, Judge.**

[1] T.J. appeals his juvenile delinquency adjudication for committing an act that would have been murder[1] if committed by an adult.[2] On appeal T.J. raises two issues, which we restate as:

> I. Whether the juvenile court committed reversible error when it admitted the victim's autopsy report over defense objection that it was testimonial hearsay that violated the confrontation clause; and
>
> II. Whether there is sufficient evidence to support T.J.'s juvenile delinquency adjudication based upon a true finding of murder.

[2] We affirm.

## Facts and Procedural History

[3] In the early morning hours of January 2, 2014, fifteen-year-old Ty.A. was walking near the intersection of Temple Avenue and Graydon Street in Indianapolis, Indiana with his thirteen-year-old half-sister, J.E., to meet Ty.A.'s friend, R.W., at the Good News Center on the corner of East Washington Street and Rural Street, when they were approached by two men. One of the men asked Ty.A. if he was "Lil' T," and when Ty.A. said, "No," one of the men shot him once in the chest. *Tr.* at 74. Ty.A. died as a result of the shot.

---

[1] *See* Ind. Code § 35-42-1-1. We note that, effective July 1, 2014, a new version of the criminal statutes was enacted. Because T.J. committed his crimes prior to July 1, 2014, we will apply the pertinent statutes that were in effect at the time he committed his crimes.

[2] A true finding was also entered against T.J. for carrying a handgun without a license, a Class A misdemeanor if committed by an adult. *See* Ind. Code § 35-47-2-1. T.J. does not challenge that true finding.

The assailants fled south on Temple Avenue.  R.W. and T.J., friends of Ty.A., were charged with his murder.

[4]     Tomecka and her children lived with Tomecka's friend Michelle and Michelle's children in a house on Warren Avenue on the Westside of Indianapolis.  On January 1, 2014, Michelle's fifteen-year old son, D.W., and three other teenagers, T.J., P.L., and R.W., were staying at the house.  Late that night, Tomecka borrowed Michelle's minivan to do some errands.  As Tomecka was leaving, R.W. came out of the house and said that Michelle wanted Tomecka to take the teens somewhere.  Tomecka drove the minivan, T.J. sat in the middle seat, and D.W. and P.L., who were dating at the time, sat in the back seat.  R.W. sat in the front passenger seat and sent a Facebook message to Ty.A. asking if the two could get together.  Ty.A. agreed to meet R.W. at the Good News Center.

[5]     Around the same time, in a home on Trowbridge Street, Ty.A. told his younger sister, J.E., that he was going out to meet R.W. at the Good News Center.  Just prior to leaving, Ty.A. asked J.E. to use her phone to send R.W. a Facebook message.  Soon thereafter, R.W. called Ty.A. and the two agreed to meet.  J.E. knew that Ty.A. was talking to R.W. because, at the end of the conversation, J.E., who had spoken with R.W. on a previous occasion, grabbed the phone and told R.W. that she was coming with her brother and they were on their way.  As they walked to the Good News Center, J.E. and Ty.A. encountered two men, each of whom had the lower half of his face covered.  After Ty.A.

denied that he was known as "Lil' T," one of the men shot Ty.A. once in the chest. *Tr.* at 74.

[6] Officer Mike Diehl ("Officer Diehl"), a K-9 handler with the Indianapolis Metropolitan Police Department ("IMPD") who responded to the dispatch, testified that he arrived at the scene around 12:51 a.m. Fresh snow allowed him to track two sets of footprints from the intersection of Temple Avenue and Graydon Street, about five houses south on the west side of Temple, and then east onto private property toward an alley between Temple Avenue and Leeds Avenue. Officer Diehl noted that the tracks stopped in the alley and that the suspects likely got into a vehicle. No spent bullets or spent shell casings were found at the scene, and the murder weapon was never recovered.

[7] IMPD Homicide Detective Greg Hagan ("Detective Hagan"), who was the lead investigator on the case, interviewed J.E. several hours after the shooting on January 2, 2014 and again on January 29, 2014. In her second interview, Detective Hagan showed J.E. numerous photographs. Looking at the photographs, J.E. said that the photo of T.J. "kind of looked like" the shooter. *Tr.* at 87.

[8] During an interview with Detective Hagan, T.J. admitted to being in the minivan with R.W. on the night of Ty.A.'s murder. T.J. remembered that R.W. had a black 32 "semiautomatic" gun when he left the minivan. *Ex. Vol.* at 80, 114. T.J. believed that Ty.A. was killed in retaliation for having sold a defective handgun to "Spider," a gang-member friend of R.W. *Id.* at 67, 71, 80-

88, 90-94. T.J. also admitted to knowing that R.W. was planning to "go pop [Ty.A.]." *Id.* at 113-14.

[9] The State filed a delinquency petition against T.J. alleging murder, carrying a handgun without a license, and dangerous possession of a firearm. The State's theory was that Ty.A., having sold a defective gun to R.W.'s friend Spider, was lured to his death by R.W.'s request that the two meet. The State maintained that T.J. and R.W. left the minivan while it was parked near the route that Ty.A. would have taken to reach the Good News Center. R.W. and T.J. walked up Temple Street, met J.E. and Ty.A. at the corner of Temple Avenue and Graydon Street, and one of them shot and killed Ty.A. R.W. and T.J. fled south on Temple and east to an alley where the minivan picked them up.

[10] During the fact-finding hearing, Tomecka testified that R.W. wanted to go to North Dearborn Street and 13th Street. When they arrived, two men, one of whom was identified as T.J.'s brother, came up to the minivan and got in. Tomecka drove everyone to the pawn shop near Michigan Street and Rural Street, a location where she parked the minivan in the pawn shop parking lot. Later, Tomecka took the two men back to North Dearborn and 13th Street. Tomecka testified that the only person who got out of the minivan at the pawn shop was R.W., who was gone "[p]robably two to five minutes." *Id.* at 273.

[11] P.L., who was sitting in the back of the minivan with her then-boyfriend D.W., testified that she did not get out of the minivan that night, nor did she hear any shots fired. P.L. said she knew that R.W. had called Ty.A. and that the two

had planned to meet. P.L. recalled that the minivan made several stops that night. P.L. testified that R.W. had a black gun and T.J. had a small silver gun. *Id*. at 230-31, 243-44. P.L. testified that, at one point, R.W. and T.J. got out of the minivan and "both went off"; the two men returned about five minutes later. *Id*. at 233. P.L. also testified that, as they all drove away, P.L. saw a body in the street and T.J. said, "There he goes." *Id*. at 237. P.L. did not recognize the body, and testified that she only found out the next morning that Ty.A. had been shot and killed. *Id*. at 237-38.

[12] J.E. testified at the fact-finding hearing that she and Ty.A. were walking along Graydon Street toward Temple Avenue when they saw two men walking toward them. As the two men approached, one asked Ty.A. if his name was "Lil' T." *Id*.at 74. Ty.A. said, "No"; J.E. confirmed that Ty.A. had never used that nickname. *Id*. at 74, 82. When the two males were about ten feet away, one of them "put up the gun and told [Ty.A.] to get on the ground and [Ty.A.] did[n't] have enough time to get on the ground and they shot him." *Id*. at 74, 79. She said that the shooter pointed a black gun at Ty.A.'s chest, so close that it was almost physically touching him, and then Ty.A fell to the ground. J.E. ran over to the shooter, who pointed the gun at her; fearing that she would be shot, J.E. dropped to the ground. The men went through Ty.A.'s pockets and then fled south on Temple Street—the direction from which they had come.

[13] Ty.A. was still breathing right after the men left. Unable to reach anyone by phone, J.E. ran back home to tell her family that Ty.A. had been shot and to call 911. J.E., her dad, and Ty.A.'s older brother's girlfriend, L.B., ran to the

scene, where L.B. attempted to perform CPR. Ty.A. took three breaths and died. *Id*. at 61.

[14] J.E. could only see part of the men's faces, which were partially covered; even so, J.E. said that one of the men in the photographs shown to her by Detective Hagan looked like the shooter. During the fact-finding hearing, the State asked J.E. if she recognized anyone in the courtroom. J.E. said that she recognized "The shooter." *Id*. at 87. When asked to point to the person she was describing as the shooter, J.E. pointed to T.J.

[15] Detective Benjamin Bierce ("Detective Bierce"), of the IMPD, introduced cell tower data as evidence of the calls made to and from the cell phone R.W. was using the night of January 1 and into the early morning hours of January 2, 2014. From this evidence, Detective Bierce was able to link the calls made and received on R.W.'s cell phone to the minivan's various locations on the night of the murder. At 12:31 a.m. on January 2, 2014, R.W. made a call to J.E.'s cell (the cell phone Ty.A. was using). Ty.A. was shot sometime after 12:31 a.m., but before 12:46.[3] When R.W. made his next call, around 12:50 a.m., the phone tower data indicated that the call was made from a location very close to the scene of the shooting.

---

[3] Officer Diehl testified that he arrived around 12:51 a.m. and it took him about five minutes to get to the scene. *Tr.* at 8.

[16] Forensic pathologist Dr. Thomas Sozio, M.D., from the Marion County Coroner's Office, testified for the State regarding Ty.A.'s autopsy—an autopsy that had been performed by another pathologist, Dr. Randy Tashjian, M.D. On December 8, 2014, the juvenile court entered true findings on the murder count and the carrying a handgun without a license count, but found the dangerous possession of a firearm count not true. *Appellant's App.* at 227-29. Following the dispositional hearing, the juvenile court placed T.J. on a suspended commitment to the Indiana Department of Correction, and placed T.J. in the Bashor Children's Home with the condition that he complete all required programming. T.J. now appeals.

## Discussion and Decision

## I. Autopsy Report

[17] Ty.A.'s autopsy was performed and the report was completed by Dr. Tashjian, a Forensic Fellow with the Marion County Coroner's Office from 2013 to 2014. At the time of the fact-finding hearing, Dr. Tashjian was unavailable to testify regarding the autopsy because he had finished his fellowship and moved to Los Angeles. The juvenile court admitted the autopsy report and allowed Dr. Sozio, another pathologist with the Coroner's Office, to testify. T.J. objected to the admission of the autopsy report because: Dr. Sozio would be vouching for a report prepared by another forensic pathologist; the autopsy report was hearsay and not the best evidence; Dr. Sozio was "not qualified to speak to [the autopsy's] findings and conclusions and can't be crossed on those matters because he is not the original Doctor that performed the autopsy"; and that Dr.

Sozio was not "qualified to testify as to the cause of death in the matter in which he did not have personal involvement." *Tr.* at 22-23. The juvenile court overruled T.J.'s objection and admitted the autopsy report; however, the juvenile court qualified its ruling by stating that Dr. Sozio could not testify about how the report was prepared or what the standard operating procedure was during the autopsy when he had no personal knowledge of this particular autopsy.

[18] Generally, a trial court's ruling on the admission of evidence is accorded "a great deal of deference" on appeal. *Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015) (citation omitted). "Because the trial court is best able to weigh the evidence and assess witness credibility, we review its rulings on admissibility for abuse of discretion and only reverse if a ruling is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights." *Id.* (citations omitted) (internal quotation marks omitted). However, T.J. contends that the juvenile court's admission of the autopsy report deprived him of his ability to fully confront Dr. Tashjian, a witness against him. Specifically, T.J. argues that the juvenile court violated his Sixth Amendment right to confrontation when it admitted the autopsy report and allowed Dr. Sozio to testify regarding its contents. Where, as here, the challenge to the admission of evidence is on constitutional grounds, this raises a question of law that is reviewed de novo. *Robinson v. State*, 5 N.E.3d 362, 365 (Ind. 2014).

[19] The Confrontation Clause of the Sixth Amendment to the United States Constitution "provides a criminal defendant has the right 'to be confronted with

the witnesses against him.'"[4]  *Torres v. State*, 12 N.E.3d 272, 273 (Ind. Ct. App. 2014) (quoting U.S. Const., amend. VI), *trans. denied*.  The right to confrontation guaranteed by the Sixth Amendment is made applicable to the states by the Due Process Clause of the Fourteenth Amendment.  *Ramirez v. State*, 928 N.E.2d 214, 217 (Ind. Ct. App. 2010), *trans. denied*.

[20]  Our court has recognized a line of United States Supreme Court cases regarding the confrontation clause.  In 2004, the Supreme Court held, "'testimonial hearsay' may not be admitted against a criminal defendant absent a showing that the witness who made the hearsay statements is unavailable for trial and that the defense had a prior opportunity to cross examine that witness."  *Torres,* 12 N.E.3d at 273 (citing *Crawford v. Washington*, 541 U.S. 36, 59 (2004)).  "In subsequent cases in the *Crawford* line, the Court went on to hold that a defendant must be afforded the right to conduct a cross-examination of a witness in conjunction with the introduction of evidence such as laboratory reports and other testimonial materials—even when those items of evidence carried "'particularized guarantees of trustworthiness.'"  *Wise v. State*, 26 N.E.3d 137, 144 (Ind. Ct. App. 2015) (citing *Melendez-Diaz v. Mass.*, 557 U.S. 305, 314-19 (2009) (noting rejection under *Crawford* of "particularized guarantee of trustworthiness" test previously established in *Ohio v. Roberts*, 448 U.S. 56, 66 (1980))), *trans. denied*.  Finally, in 2011, the United States Supreme Court held:

---

[4] A child has rights in juvenile court during a delinquency hearing, including the right to confront and cross-examine witnesses against the child.  Ind. Code § 31-37-12-5.

The question presented is whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification. We hold that surrogate testimony of that order does not meet the constitutional requirement. The accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had the opportunity, pretrial, to cross-examine that particular scientist.

*Torres*, 12 N.E.3d at 273-74 (quoting *Bullcoming v. New Mexico*, ⎯ U.S. ⎯, 131 S. Ct. 2705, 2710, 180 L. Ed. 2d 610 (2011)).

[21] T.J. argues that his ability to confront the doctor who conducted the autopsy was of critical importance. Here, Dr. Sozio "testified based on his review of Dr. Tashjian's autopsy report." *Appellant's Br.* at 25. He testified about the condition of Ty.A.'s body, "the external and internal injuries observed, the absence of stippling and powder burns on the body which can result from a gunshot wound, and the purported trajectory of the lethal bullet including the resulting entrance and exit wounds." *Id.* at 25 (citing *Tr.* 27-31). Dr. Sozio also was allowed to testify that it was Dr. Tashjian's conclusion that the cause of death was "a single gunshot wound to the chest," and that the manner of death was "[h]omicide." *Tr.* at 35. T.J. argues that Dr. Sozio should not have been allowed to testify regarding Dr. Tashjian's conclusions where Dr. Sozio's "sponsoring testimony served as a witness against [T.J.]," and, without Dr. Tashjian's live testimony, T.J. had no opportunity to "fully and effectively

probe and challenge [Dr. Tashjian] through cross-examination." *Appellant's Br.* at 26.

[22] We recognize the importance that the United States Supreme Court has placed on a defendant's right to confront a witness who offers testimonial hearsay against him, including testimony in the form of a forensic laboratory report like an autopsy. *Bullcoming*, 131 S. Ct. at 2710 (surrogate testimony of forensic laboratory report containing testimonial certification does not meet constitutional requirement to confront witness against defendant, unless analyst who made certification is unavailable and defendant had opportunity to cross-examine analyst prior to trial). Here, however, even if the autopsy's admission was testimonial hearsay that implicated T.J.'s Sixth Amendment confrontation right, such error was harmless.

[23] T.J. objects to Dr. Sozio's description of the external and internal injuries observed on Ty.A.'s body, the absence of stippling and powder burns on the body, the purported trajectory of the lethal bullet, and that the cause of death was homicide, but T.J.'s conviction did not hinge on the injuries Ty.A. sustained, the trajectory of the bullet, or the proximity of the gun to the victim. The State placed no reliance on the autopsy to prove its case. Indeed, it was of no import that Dr. Sozio testified about Dr. Tashjian's conclusion that the manner of Ty.A.'s death was "[h]omicide." *Tr.* at 35.

[24] T.J. made no claim that Ty.A.'s death was accidental or the result of a suicide, and the only theory offered to the juvenile court was that Ty.A. died as the

result of a gunshot wound to the chest. J.E. testified that in the early hours of January 2, 2014, she and her brother were approached by two men and that one of the men pointed a gun to her brother's chest and, without provocation, shot Ty.A. dead. The fact that this was a homicide was not in question; the issue was whether the evidence was sufficient to support a true finding that T.J. had committed murder. Error, if any, in the introduction of the autopsy report was harmless.

## II. Sufficiency

[25] T.J. challenges the sufficiency of the evidence supporting his adjudication as a delinquent for having committed murder as a principal or an accomplice. When the State seeks to have a juvenile adjudicated a delinquent for committing an act that would be a crime if committed by an adult, the State must prove every element of that crime beyond a reasonable doubt. *Z.A. v. State*, 13 N.E.3d 438, 439 (Ind. Ct. App. 2014). "When reviewing the sufficiency of the evidence supporting a juvenile adjudication, we neither reweigh the evidence nor judge the credibility of the witnesses." *Id.* We consider only "the evidence of probative value and the reasonable inferences that support the determination." *Id.* If there is substantial evidence of probative value from which a reasonable trier of fact could conclude beyond a reasonable doubt that the juvenile committed a delinquent act alleged, we will affirm the adjudication. *K.F. v. State*, 961 N.E.2d 501, 506 (Ind. Ct. App. 2012), *trans. denied*. "The uncorroborated testimony of one witness may be sufficient by itself to sustain an adjudication of delinquency on appeal." *D.W. v. State*,

903 N.E.2d 966, 968 (Ind. Ct. App. 2009), *trans. denied*. Reversal is appropriate only when reasonable persons would not be able to form inferences as to each material element of the offense. *Green v. State*, 937 N.E.2d 923, 927 (Ind. Ct. App. 2010), *trans. denied*.

[26] To support T.J.'s true finding for murder as a principal or an accomplice, the State was required to prove beyond a reasonable doubt that T.J. knowingly or intentionally killed Ty.A. Ind. Code § 35-42-1-1. To support a true finding that T.J. was an accomplice, the State was required to prove beyond a reasonable doubt that T.J. knowingly or intentionally aided, induced, or caused another person (here, R.W.) to murder Ty.A.[5] *See* Ind. Code § 35-41-2-4. It is well established that a person who aids another in committing a crime is just as guilty as the actual perpetrator. *Green*, 937 N.E.2d at 927 (citing *Vandivier v. State*, 822 N.E.2d 1047, 1054 (Ind. Ct. App. 2005), *trans. denied*). To be convicted as an accomplice, it is not necessary for a defendant to have participated in every element of the crime. *Id.* (citing *Bruno v. State*, 774 N.E.2d 880, 882 (Ind. 2002)). While mere presence at the scene of the crime is insufficient to establish accomplice liability, presence may be considered along with the defendant's relation to the one engaged in the crime and the

---

[5] Here, the juvenile court had to determine whether T.J. had committed one act of murder. However, there were two different theories upon which the juvenile court could have found that T.J. committed this one act—either as the principal or an accomplice. *Taylor v. State*, 840 N.E.2d 324, 333 (Ind. 2006). "[T]he Indiana statute governing accomplice liability does not establish it as a separate crime, but merely as a separate basis of liability for the crime charged." *Hampton v. State*, 719 N.E.2d 803, 807 (Ind. 1999).

defendant's actions before, during, and after the commission of the crime. *Id.* (citing *Alvies v. State*, 905 N.E.2d 57, 61 (Ind. Ct. App. 2009)).

[27] "A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." Ind. Code § 35-41-2-2(a). "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." Ind. Code § 35-41-2-2(b). "Knowledge and intent are both mental states and, absent an admission by the defendant, the trier of fact must resort to the reasonable inferences from both the direct and circumstantial evidence to determine whether the defendant has the requisite knowledge or intent to commit the offense in question." *Stokes v. State*, 922 N.E.2d 758, 764 (Ind. Ct. App. 2010), *trans. denied*. The intent to commit murder may be inferred from the nature of the attack and the circumstances surrounding the crime, and it is within the province of the jury to draw an inference of knowledge or intent from the facts presented. *Whatley v. State*, 908 N.E.2d 276, 284 (Ind. Ct. App. 2009), *trans. denied*.

[28] The facts most favorable to the adjudication are that in the early morning hours of January 2, 2014, J.E. was walking with her brother, Ty.A., when two men approached from the opposite direction. The men asked Ty.A. if he was "Lil' T," and when Ty.A. said, "No," one of the men pointed a gun directly at Ty.A.'s chest and shot him dead. *Tr.* at 74. The facts were clear that the person who committed the crime, knowingly or intentionally murdered Ty.A. The only question before the juvenile court was whether it was T.J. who committed the murder as either the shooter or an accomplice.

[29] The motive for the murder was that Ty.A. had sold a defective handgun to Spider, R.W.' friend who was a gang member. R.W. said that Ty.A. was "beefing" with the gang over the defective gun. *Appellant's App.* at 30. In one of his statements to Detective Hagan, T.J. said that he overheard R.W. and D.W. talking at Michelle's house on the night of January 1, 2014. From that conversation, T.J. said, referring to Ty.A., "I already know we about to go pop him." *Ex. Vol.* at 114. R.W. sent a Facebook message to Ty.A. "to see where he at and stuff." *Id.* at 115. As the teens were leaving the house to get into Michelle's minivan, R.W. said "let's get him." *Id.* at 116.

[30] In one of his statements to Detective Hagan, T.J. said that R.W. had a big black 32 "semiautomatic" gun in the minivan and that R.W. and D.W. left the van for ten minutes while it was parked at the pawn shop. *Ex. Vol.* at 80, 114. P.L., who was the passenger in the back seat of the van, testified that, on the night in question, R.W. had a black gun and T.J. had a small silver gun and that R.W. and T.J. got out of the minivan and "both went off," returning about five minutes later. *Tr.* at 233. P.L. also testified that, as they all drove away, P.L. saw a body in the street and T.J. said, "There he goes." *Id.* at 237. P.L. did not recognize the body and testified that she only found out the next morning that Ty.A. had been shot and killed.

[31]     Here, witnesses presented conflicting evidence regarding the events surrounding the murder of Ty.A.  The juvenile court believed the testimony of P.L.[6]  During the fact-finding hearing, the State asked J.E. if she recognized anyone in the courtroom.  J.E. said that she recognized "The shooter."  *Id*. at 87.  When asked to point to the person she was describing as the shooter, J.E. pointed to T.J.  Even if T.J. was not the shooter, his prior knowledge that there was a plan to shoot Ty.A., P.L.'s testimony that T.J. had a gun and left the van with R.W., and T.J.'s continued association with other suspects supported the juvenile court's true finding that T.J. was an accomplice to Ty.A.'s murder.  *See Green*, 937 N.E.2d at 927 ("While mere presence at the scene of the crime is insufficient to establish accomplice liability, presence may be considered along with the defendant's relation to the one engaged in the crime and the defendant's actions before, during, and after the commission of the crime.").

[32]     It is not an appellate court's role to substitute its judgment for the fact-finder regarding the assessment or weight of the evidence, or the credibility of

---

[6] At the close of the fact-finding hearing, the judge noted the difficulty in investigating the case because "everybody lied, everybody, everybody, everybody."  *Tr*. at 318.  Addressing T.J., the judge continued:

> As confusing as everything else is in this case I believe [P.L.] told the truth.  I believe you had a gun that night as did [R.W.].  I believe you [knew] what was going to go on that night because you told [the police] that before you took it back.  I believe you got out of that van because [P.L.] said you did and she didn't have a reason to lie and I believe you were there.  And I believe her when she says that there was a body in the street and that you said there he goes.  And that[, T.J.], is either murder or accomplice liability.

*Id*.

witnesses. *Smith v. State*, 34 N.E.3d 1211, 1222 (Ind. 2015) (citing *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005) ("Upon a challenge to the sufficiency of evidence to support a conviction, a reviewing court does not reweigh the evidence or judge the credibility of the witnesses, and respects 'the jury's exclusive province to weigh conflicting evidence.'")). Here, the facts most favorable to the adjudication are sufficient to support the court's decision; accordingly, we affirm the judgment of the juvenile court.

[33] Affirmed.

Najam, J., and Barnes, J., concur.